Charles F. Curley, of Wilmington, Del., George F. O'Neill, of New York City, Edwin S. Clarkson, of Washington, D. C., and Charles A. Collin, of New York City, for defendants.

## CINEMA PATENTS CO., Inc., v. CRAFT FILM LABORATORIES, Inc., et al.

### No. 799.

District Court, D. Delaware.

Feb. 5, 1932.

NIELDS, District Judge.

This is an infringement suit against the purchaser of patented machines. The two United States patents in suit are for inventions of Leon Gaumont, a citizen of France, and cover machines for developing motion picture films. They issued in 1916 and were acquired by plaintiff in April, 1930, whereupon this suit was brought in June, 1930. The purchaser of the machines is the defendant Craft Film Laboratories, Inc., with a laboratory at Flushing, Long Island. The term "defendant" herein refers to this defendant. The defendants Steven J. Devoe, Nat Saland, and Harry Glickman are stock-

holders, directors, and officers of defendant. The infringement charged in the bill is based on the replacing of numerous parts of the machines by the owners thereof. Plaintiff charges that the replacement of material or essential parts of the machines constitutes infringement. Defendant contends that the replacement of such parts must amount to a rebuilding of the machines to constitute infringement.

A short review of past events will be helpful. Patent No. 1,177,697, issued April 4, 1916, to Leon Gaumont. Patent No. 1,209,696, issued December 26, 1916, to Leon Gaumont, assignor to Societe Etablissements Gaumont, of Paris, France. These patents illustrate and describe a process and apparatus for developing, fixing, washing, toning, and drying motion picture films. The defendants admit the validity of both patents. No prior art or other evidence is offered to limit the scope of the claims.

Gaumont and the Societe held title to the patents from the time of their issuance in 1916 until October 22, 1926, at which time they assigned all their right, title, and interest therein to Famous Players-Laskey Corporation, subject to certain reservations and conditions. After certain other assignments, subject to like reservations and conditions, the patents in suit came into the possession of the plaintiff April 11, 1930. It will be assumed that the plaintiff has full right to maintain this suit.

The first patent, No. 1,177,697, covers the division of the machine known as the "wet end" in which the film is treated in fluid baths. The second, No. 1,209,696, covers the "dry end" in which the developed film is dried and wound up ready for use. The two divisions are located in proximity. They are motivated by an electric motor and operate as a single unit. The film passes through the machine and is developed, fixed, washed, sometimes toned and dried.

Gaumont machines are approximately thirty feet long and six feet high. The physical structure of the machine is important. The tank machines are composed of a succession of baths or tanks containing in order of use developing solution, fixing or hypo sulphide solution, and clear water for washing. The developing tank ordinarily consists of one compartment; the hypo tank of two compartments; and the washing tank of four compartments. An overhead casting rests on the upper edge of each compartment carrying a driving shaft with toothed sprockets, one for guiding the film in and one for guiding it out, and also an iron frame consisting of two vertical rods and two horizontal shafts, one near the top and the other near the bottom of each compartment. The horizontal shafts carry a series of freely mounted hard rubber spools. At one end of the driving shaft is a beveled gear by which the shaft is driven. This structure is duplicated in each compartment. Between the developing tank and the hypo tank is a rinsing compartment with fresh water.

The film is introduced over an initial sprocket into the compartment and is trained up and down over the upper and the lower series of freely rotating spools, describing a general spiral course from one side of the compartment to the other. It is brought up out of the compartment over the second sprocket and is propelled towards the next liquid receptacle. After leaving the developing bath, the film is rinsed in a tube and then enters the hypo section. The movement of the film within the compartments of the tanks is repeated until it has passed entirely through the wet end.

In the tube machines, tubes are substituted for tanks. At the upper end of each tube is a free roller and a driven sprocket. The film passes into the tube over the free roller and forms a loop around a weighted free spool within the tube and passes up out of the tube over the driven sprocket into the next tube. The treatment of the film is the same as in the tank machines.

The developing fluid is maintained in a central reservoir. Within this reservoir is a coil through which cold brine is circulated for the purpose of cooling, or steam for the purpose of warming, thus enabling the temperature of the developing fluid to be regulated and maintained at will.

To every tank and tube machine there is annexed a cabinet or drying device. After the film has been treated in the liquid baths, it is conducted through the cabinet in which conditioned air is circulated to dry the film preparatory to winding it upon a reel. A series of spools on upper horizontal shafts and a parallel series of spools on lower horizontal shafts provide means whereby the film may be carried up and down a plurality of times in order to be thoroughly dried. In addition to the spools on the upper shafts, there are two sprockets keyed to the upper shafts to propel the film through the dryer.

Gaumont caused to be organized Gaumont Company and Gaumont Realty Company, New York corporations. Through them a

laboratory was established at Flushing, Long Island, for developing motion picture films. In 1909 three tank machines were there installed, and in 1911 three other tank machines were added. Thereafter they have been used more or less continuously. These machines were made in the workshops of Gaumont's French company. There was installed in the Flushing plant a machine shop fully equipped to repair and replace any parts of the developing machines that might become worn or broken. The laboratory at Flushing was operated by Gaumont through his two New York corporations from about 1909 to 1920. In the latter year Gaumont, the patentee, through his New York companies, sold the laboratory and equipment to Associated Screen News, Inc., for $100,000. Later in 1920, Gaumont and his French company agreed to sell to Patrick A. Powers twenty motion picture developing machines of the tube type with dryers for $82,500. Of this sum $30,000 was for the machines and $52,500 gross royalties. Powers assigned this agreement to Associated Screen News, Inc. The machines were installed in 1922 and the full price was paid by the purchaser. However, only six of these machines were operated until 1929.

In 1929 Associated Screen News, Inc., leased the property and plant to the defendant Steven J. Devoe, with an option to purchase. This lease was assigned to the defendant Craft Film Laboratories, Inc., who exercised the option to purchase and thereafter operated the laboratory.

The defendants admit that the twenty-six machines are constructed and operated in accordance with the claims of the patents in suit. The plaintiff admits that they are the twenty-six machines purchased from the patent owner.

In the normal use and operation of these machines there was a constant replacement of parts. These parts were made in the machine shop at the plant, imported from the patentee in Paris, or purchased in the open market. All of these methods were employed by the Gaumont Company from 1909 to 1920 and the same methods were followed by Associated Screen News, Inc., and by defendant. Throughout this time no charge of infringement was ever made until the present suit was brought.

The plaintiff relies on infringement of claims 1, 2, and 17 of patent No. 1,177,697, and claim 15 of patent No. 1,209,696.

The defendant contends that as the plaintiff acquired the patents subject to a reservation, "it will not sue or in any other way interfere with * * * the use or sale of any machines heretofore sold in the United States by said Societe or its representatives," it has no right to sue for infringement. This contention is clearly unsound. It is elementary that the absolute and unqualified sale of a patented machine gives the purchaser the right of use and sale of such machine, and the further right not to be sued or interfered with by reason of such use or sale. In other words, the assignment of the patents recites nothing more than terms that are always implied in such assignments.

The first question as to infringement is the use of new sprockets in the dryers attached to all twenty six machines. The defendant admits that it replaced certain new sprockets in the dryers. Therefore, plaintiff claims infringement is clear, because sprockets are separately patented parts of the machines and replacing and using such sprockets infringes claim 15 of the dryer patent, notwithstanding the replacement of such sprockets when viewed from the standpoint of the machine as a whole would be considered proper replacement. Claim 15 reads: "15. A drying device for photographic films or prints having driving perforations therein, comprising means for passing the film or print through the drying device, said means comprising toothed rollers for engaging perforations in and driving the film."

It is apparent from the reading of the patent that this is what is commonly known as a "combination patent" and each claim a "combination claim." Plaintiff has fallen into the error of attaching a wrong meaning to the word "comprising" as used in this claim. "Comprising" here means "including." This is apparent from the significance that attaches to the use of the same word in all other claims of the patent. If this claim had read, "In a drying device, a sprocket," etc., it would be obvious that the sprocket would be a separately patented device. This interpretation of the claim is sustained by the case of C. & R. Research Corporation v. Write, Inc. (D. C.) 19 F.(2d) 380. In that case Judge Morris held "claim 19" was not infringed by defendant furnishing an "equalizing bar" used in a paper coating machine, because the claim was directed to the machine as a whole, and was not directed to a separately patented bar even though that bar was an important element of the claim. At the same time, however, he held that the furnishing of such a bar did infringe "claim 23" of the patent be—

cause that claim, reading, "In a paper-coating machine, an equalizing bar," etc., covered "the bar only." Following that case here, I am satisfied that the sprockets are not separately patented in claim 15 of the dryer patent. For similar reasons plaintiff's contention as to claim 17 falls.

The case reduces itself to the question whether the defendant in replacing worn-out parts was within the well-recognized rule that a purchaser of a patented machine is entitled to replace worn-out parts so long as the identity of the machine is not destroyed. The owner of an unpatented machine, incident to his ownership, of course, has the right to replace parts of the machine worn-out or destroyed. When such an owner ceases to replace parts and when he starts to rebuild his machine is difficult to fix. Obviously the line is not crossed until the physical life of the machine is far spent. The elements of the machine must be so far physically depleted that the identity of the machine as such is lost. The purchaser of a patented machine is exactly like the owner of an unpatented machine, and the same test as to infringement should apply to him.

In Goodyear Shoe Machinery Co. v. Jackson, 112 F. 146, 149, 55 L. R. A. 692, Judge Colt, speaking for the Circuit Court of Appeals for the First Circuit, said: "In approaching the question of infringement by the purchaser of a patented machine, it is important to bear in mind what the patentee sold and the purchaser bought. The patentee has parted with his machine and the monopoly that goes with it, and the purchaser has bought the machine with the right to use the patented invention until the machine is worn out or destroyed. When the machine is worn out, or substantially destroyed, his right to use the patented invention ceases; and when he rebuilds his machine, and thereby makes substantially a new machine, it becomes subject to the patentee's monopoly, the same as in the case of any other person who unlawfully makes the patented machine. When the patented machine has passed outside the monopoly by a sale and purchase, the patentee has no right to impose any restrictions on its use for his own benefit. He cannot forbid the further use of the machine because it is out of repair in consequence of the wearing out or breaking of some of its parts, and so oblige the purchaser to buy a new machine. The purchased machine has become the individual property of the purchaser, and is like any other piece of property which he owns. He may sell it, or he may use it so long as its usefulness lasts, and then throw it away, or dispose of it for junk. He may prolong its life and usefulness by repairs more or less extensive, so long as its original identity is not lost. He is only prohibited from constructing a substantially new machine. He cannot, under the pretext of repairs, build another machine. * * * Where the patent is for a machine, which commonly embraces the combination of many constituent elements, the question of infringement by the purchaser will turn upon whether the machine is only partially worn out or partially destroyed, or is entirely worn out, and so beyond repair in a practical sense."

To like effect are Wilson v. Simpson et al., 9 How. 109, 13 L. Ed. 66; Chaffee v. Boston Belting Co., 22 How. 217, 223, 16 L. Ed. 240; Morrin v. Robert White Engineering Works, 143 F. 519 (C. C. A. 2); Foglesong Mach. Co. v. J. D. Randall Co., 239 F. 893 (C. C. A. 6).

This suit should be distinguished from a somewhat similar line of cases, where suits are brought for contributory infringement. There the defendant manufactures one or more of the elements of some patented device for the trade. He wholly ignores the patent and the rights of the holder of the patent. He claims immunity because he is manufacturing and selling parts to those who may be purchasers of a patented machine to enable them to replace parts worn out or destroyed. Courts are prone to hold such a manufacturer to a strict account. If he proves that he manufactured to fill the present need of a particular purchaser of patented machines to replace parts worn-out or destroyed, he stands in the same position as the purchaser.

Under the above principles of law has defendant infringed? In answering this query the language of Mr. Justice Holmes in Heyer v. Duplicator Mfg. Co., 263 U. S. 100, 102, 44 S. Ct. 31, 32, 68 L. Ed. 189, furnishes a helpful guide. He said: "We have only to establish the construction of a bargain on principles of common sense applied to the specific facts."

The tank and tube machines in this suit are made up of a combination of parts or elements, among which are castings over the tanks and tubes sustaining the film and transmitting mechanisms, tanks, and tubes containing the fluids, drying cabinets, electric motors, reservoirs, and numberless

sprockets, sprocket rings, suspension rods, shafts, idle rollers, spools, gears, and other small parts making useful the principal elements.

No one of the above parts was separately patented in the patents in suit. The patentability of the machines lies in the combination. Many parts of the machines were frequently replaced because of the use of chemical solutions in the developing process.

Plaintiff has grouped in a summary certain replacements under the heading, "The following replacements occurred during the year 1929." The record, however, does not disclose at what time during the year such replacements were made, whether at regular or irregular intervals, nor does the plaintiff distinguish between the fourteen-tube machines which were operated for the first time during that year, although acquired from the patent owner in 1920, and the other machines. There is little dispute between the parties as to what parts were replaced or that such parts were essential to the operation of the machines as a whole.

Did the repeated replacement of certain parts change the identity of the machines? The machines were costly. The parts replaced were relatively cheap. It is true that in 1929 numerous parts of the mechanisms for transmitting the film through the machines were replaced, but these parts were relatively cheap and shortlived. It is quite certain that the patentee and subsequent owners of the patents contemplated frequent replacement of such parts as is evidenced by the practice that had been followed during the preceding twenty years.

Who is better qualified than Gaumont to throw light on the subject of replacements? He created the machines. He knew what were proper replacements. He testified that the machines were built in Paris under his supervision. He appointed Schwengler superintendent at the laboratory at Flushing. For about ten years after building the Flushing laboratory, Gaumont made frequent visits to the United States and supervised the operation of the machines. For six years after the sale of the plant, and while still owner of the patents, he revisited the laboratory. During those years the question of infringement was a very material one to him. He observed the repeated replacements and made no claim of infringement. Plaintiff's witness Schwengler and defendant's witness Geiger confirmed Gaumont, and further testified that the same kind of replacements in

all the machines in use continued after 1926 until the present.

Plaintiff further contends that defendant infringed the process of claim 1 of the developing patent. I fail to see any force in this contention. The machines were purchased from the patent owner and were thus released from the monopoly of the patent. The purchaser acquired an unqualified and unrestricted right to their use. That use included the practice of the process of claim 1. This is not the case of the use of a patented machine though purchased from the patent owner in such a way as to violate the seller's exclusive property in another invention.

I conclude that the machines in question at no time were beyond repair and that the defendants did not infringe the patents in suit by rebuilding any of the machines.

The bill of complaint should be dismissed.