**NEWTON STEEL CO. v. SURFACE COMBUSTION CO.**

**DURALOY CO. v. SAME.**

**SURFACE COMBUSTION CO. v. NEWTON STEEL CO. et al.**

**Nos. 6548–6550.**

Circuit Court of Appeals, Sixth Circuit.
Jan. 17, 1935.

F. O. Richey, of Cleveland, Ohio (Thomas F. Veach, B. D. Watts, Richey & Watts, and Belden, Young & Veach, all of Cleveland, Ohio, on the brief), for Newton Steel Co. and Duraloy Co.

A. C. Denison, of Cleveland, Ohio, and B. H. Christy, of Pittsburgh, Pa. (Christy, Christy & Wharton, of Pittsburgh, Pa., on the brief), for Surface Combustion Co.

Before MOORMAN, SIMONS, and ALLEN, Circuit Judges.

MOORMAN, Circuit Judge.

The Surface Combustion Company brought this suit against the Newton Steel Company, the owner and operator of steel treating furnaces, and the Duraloy Company, the builder of the Newton Company's furnaces, for infringement of the Marsh & Cochran patent, 1,610,567, for a method of annealing sheet steel. Defendants denied validity and infringement of the patent, and the Duraloy Company by counterclaim charged the plaintiff with infringing two Kathner patents of which it was the exclusive licensee—No. 1,725,398, and reissue No. 17,413. The special master to whom the case was referred by the District Court found the Marsh & Cochran patent valid, and though not finding infringement, found that the Newton Company possessed the means of infringement, and recommended the granting of an injunction against that company. He further found that the Kathner patents were invalid but, if valid, were not infringed

by the plaintiff. The court confirmed and approved the report of the master, dismissed the counterclaim, and entered a decree adjudging the Marsh & Cochran patent valid and enjoining the Newton Steel Company from infringing it.

For some time before the filing of the Marsh & Cochran application there had been an increasing demand for sheet steel susceptible of being pressed between dies and drawn into rigid forms for bodies, hoods, and other parts of automobiles. The rolling of sheet steel causes it to become fibrous and stringy. Such steel without further treatment is not responsive to shaping between dies; it is brittle and will split and break along the fibers, if not in the process of drawing, later when it is placed under the strains of use. This was known in the art, and it was also known that by heating the rolled metal to a temperature of 1600° or 1650° F. the strings and fibers in the metal would be converted into grains or crystals uniting with one another and restoring the metal to its prerolled or normal condition. This restoring of the metal interiorly to its normal condition is annealing or "normalizing" it. If steel is heated in an oxidizing atmosphere beyond a temperature of 1550° F., a scale or oxide will form on the outside of the metal and affect its quality. So in order to avoid the formation of scale on the metal in the process of annealing, it is necessary that the heating above a temperature of 1550° F. and the cooling after annealment to that temperature be conducted in a nonoxidizing atmosphere. All of this was well known before Marsh & Cochran.

The process claimed by Marsh & Cochran is an adaptation to formula of the knowledge and experience of those engaged in the art. As described in claim 2 in suit, it consists of three steps: (1) Heating the sheet material within a maximum time interval of seven minutes and while maintained in a nonoxidizing atmosphere to a temperature of 1750° F. as a minimum; (2) cooling the material within a maximum interval of two minutes and while still maintained in a nonoxidizing atmosphere to a temperature of 1550° F. as a maximum; (3) and completing the cooling in the open air. The third step is not shown in the specifications or proofs to have any relation to the effectiveness of the process, either in quality of product or convenience of practice. Its only effect is to hasten the completion of the cooling, an obvious result of exposure in a cooler atmosphere. That it is unimportant is shown in the specifications, where it is said, "we allow the cooling" from the scaling temperature, 1550° F., "to proceed with no further concern to maintain a non-oxidizing atmosphere, and preferably in the open air, until the material comes to a dull red heat." We think, therefore, that this step adds nothing of merit to the process and is to be given no effect in determining patentability.

The other steps of the process appear separately and in like relation to each other in the prior art. A complete anticipation, in our opinion, is Ruder, 1,156,496, issued October 12, 1915, for a process for annealing steel containing more silicon than is present in steel used for automobile parts. Steel containing a small percentage of silicon is more ductile and less permeable than steel containing a higher percentage of silicon, and Ruder, it is true, was seeking a steel with greater permeability or magnetic properties for making transformers, armatures, and other electrical apparatus. The plaintiff contends that Ruder cannot be relied upon to defeat invention because of the result therein sought and the character of the steel upon which the process was practiced. This contention cannot prevail, for although Marsh & Cochran use the process on a particular quality of steel to improve ductibility, while Ruder used it on steel having more silicon to improve permeability, it is in both cases a process for annealing steel—a process producing known results variable according to the contents of the steel. The two kinds of steel to which Ruder and Marsh & Cochran contemplated applying it are not so different in contents or properties that its prior use on one of them is not a valid reference against patentability in its application to the other. Lovell Manufacturing Co. v. Cary, 147 U. S. 623, 13 S. Ct. 472, 37 L. Ed. 307. Ruder heated his steel in a nonoxidizing atmosphere to 1000° C., equivalent to 1830° F., and then cooled it in a nonoxidizing atmosphere at a rate approximating the rate of heating. While he heated it to a higher temperature than 1750° F. and provided no time limit in which the cooling should be effected, except that it should be at approximately the rate of heating, he did provide for annealing in a temperature higher than Marsh & Cochran's maximum, and for cooling, both in a nonoxidizing atmosphere. To apply this process to a new use, the annealing of sheet steel with a smaller percentage of silicon to be formed into automobile parts is of course not invention.

Nor was it invention to limit the period for heating to the maximum temperature or the time for reducing from that temperature to the nonscaling temperature. It was well known before Marsh & Cochran that steel would anneal in a temperature of 1600° to 1650°, though it had been found out, as Cochran admits, that to anneal in that temperature would require considerably more time than in a higher temperature. It was obvious, then, that quick annealing required a higher temperature, and that production could be speeded up by heating the metal to a temperature of 1750° or preferably, as stated in the Marsh & Cochran specifications, 1800°. Ruder had shown that additional speed could be had by a still higher temperature, 1500° C., equivalent to 2700° F. He had said in his specifications, that by operating the furnace at this higher temperature he had "found it possible to anneal the sheets by subjecting any given part of the same to the heating zone for about ten seconds." He had pointed out, too, that it might be desirable to operate the furnace at a lower temperature, stating, "in that case of course, the annealing period * * * may be as long as five minutes." It may be assumed that the metal would be injured if permitted to remain too long in an excessively high temperature; but Ruder had shown that it would not be injured by subjecting it to a temperature several hundred degrees in excess of the maximum fixed by Marsh & Cochran or by heating the metal itself to a temperature of at least 1830°. It is claimed for Marsh & Cochran that their reason for selecting a maximum of 1750° or 1800° with a time limit in which to reach it was that there is a zone or range in the neighborhood of this maximum in which the crystals in the metal will begin to grow and become larger, and it was their conception that in order to avoid grain growth and meet tonnage demands, the metal should be quickly taken to a maximum temperature of 1750°, or preferably higher, and then quickly cooled. There is nothing in the patent to indicate a grain growth zone such as referred to by the plaintiff's expert witness, or to show any reason for taking the metal to the maximum temperature called for in the claim. If it be accepted as a fact that there is such a grain growth range in which the metal would be injured if permitted to remain too long, still Ruder had shown that the metal could be carried without injury into and beyond that range. He had stated in his specifications that it could be carried almost a thousand degrees higher if done quickly, in ten seconds, though he seemingly preferred the lower maximum temperature of about 1830°, in which the annealing period would be approximately five minutes. Marsh & Cochran use a still lower maximum with a longer annealing period of seven minutes. Cochran testified that his idea at the time of filing the patent application was to heat "as fast as possible so as to get as much tonnage as possible from the equipment." He further said that maximum drawability could be attained by "heating in 3¼ minutes to 1900 degrees, or thereabouts, or else in seven minutes to * * * 1800 degrees." It is plain, we think, that Marsh & Cochran selected an operative maximum temperature with the view of increasing production tonnage to the maximum for available equipment. With other purposes and equipment therefor they might have selected any other temperature between 1650°, the low annealing point, and the high points of Ruder, and determining the time in which the metal would anneal by taking it to that temperature, made claim to a new process containing such time and maximum temperature limitations. What they have attempted to do, it seems to us, is to carve out a patentable method from the old Ruder method. It may be that their time and heat limits will increase the production which they sought, but the conception of such limits was within the range of intelligent application of the Ruder process, and is not invention.

■ The claims of the reissue Kathner patent which the Duraloy Company asserts are infringed by plaintiff are 15 and 17. Both relate to a continuous metal-treating, open-ended furnace, with communicating heating and cooling chambers, means for continuously moving metal to be treated successively through the heating and cooling chambers, and means for continuously passing heated gas through the cooling chamber about the metal and out through the open exit end of the cooling chamber to control the rate and uniformity of the cooling of the metal. The only difference between the two is that claim 15 calls additionally for a restricted passage between the chambers and for a cooling chamber roof imperforate for a large portion of its length beginning at the restricted passage, while 17 does not disclose an imperforated roof in the cooling chamber, but calls instead for a smaller cross-sectional area in the cooling chamber than in the heating chamber. The patentee and the

Duraloy Company by disclaimer sought to restrict the scope of the claims to metal sheet treating furnaces in which the furnace causes a gradual and prolonged cooling of the metal sheet in the furnace, excluding the cooling of all other forms of steel or metal.

We assume for the purpose of decision that the disclaimers are effective for what they are worth. As limited by them, the claims describe a furnace for practicing the process disclosed by Ruder and also by Marsh & Cochran, which, as we have seen, is not a patentable process as against Ruder. Neither of these patents made claim to a furnace, but furnaces for annealing steel and other metals with communicating heating and cooling chambers or zones were old before Kathner. Reichhelm, 733,274; Anthony, 1,525,905. More than a year before Kathner filed his original application, the Sharon Steel Hoop Company built and put into operation at Campbell, Ohio, a furnace known in the record as the Hazelton furnace. This furnace had a communicating heating and cooling chamber, though the cooling chamber was shorter than in Kathner. The extension in Kathner of the cooling chamber of the Hazelton furnace, in our opinion, was not invention. The mere increase in dimensions or proportions of a known device, even if a better result be obtained, when as here within the reach of mechanical skill, is not an exercise of the inventive faculty. Powers-Kennedy Co. v. Concrete Co., 282 U. S. 175, 185, 51 S. Ct. 95, 75 L. Ed. 278; A. O. Smith Corp. v. Petroleum Iron Works Co., 73 F.(2d) 531 (6 C. C. A.), decided November 10, 1934. The prolonged cooling feature sought to be imported into the claims by disclaimer is a function of the apparatus for which the claims are made and cannot impart validity to them. Nor can the limitation on the character of the metal validate the claims as against an earlier device operable as to the same character of metal with a like result.

The apparatus claims in Kathner, No. 1,725,398, call for a furnace similar to the furnace disclosed in the reissue patent except as to the cooling chamber, which is described as having a length about one and one-third greater than that of the heating zone or chamber. Disclaimers restricted the claims to sheet metal treating furnaces in which the dissipation of heat from the cooling chamber was controlled by insulation in parts of the chamber. It is doubtful that insulation of part of the cooling chamber can be legally imported into the claims by disclaimer, but even if it can be, the only difference between the furnace thus described and the Hazelton furnace consists of this element plus the relative lengths of the heating and cooling chambers. As has been already stated, it did not require inventive thought to extend the length of the cooling chamber in relation to the length of the heating chamber. Neither do we think there was invention in the concept or forms specified in the claims of employing insulating material for heat retardation.

The method claims of the Kathner patent, 1,725,398, of which claim 4 is typical, call for a process for heating and treating metal consisting of a heating and cooling zone, open ended, the cooling zone being at least equal in length to that of the heating zone, controlling the amount of heat admitted to the cooling zone from the heating zone, continuously passing heated gases through the cooling zone about the metal being treated and out through the exit end of the cooling zone, continuously moving the metal being treated through the heating zone and then through the cooling zone, and controlling the time rate and uniformity of cooling of the metal in the cooling zone. This is a method embodying the functions of the apparatus claims. It was disclosed in Ruder, which has been held to defeat invention for Marsh & Cochran, and was anticipated in the operations of the Hazelton and other earlier furnaces. Neither this patent nor the reissue patent can be sustained as a valid invention as against the prior art.

The decree is affirmed as to the counterclaim, but so far as it sustains the Marsh & Cochran patent and issues an injunction against the Newton Company is reversed and the bill dismissed. The costs will be paid one-half by the plaintiff and one-half by the defendants.