## DURALOY CO. v. CARNEGIE–ILLINOIS STEEL CORPORATION.

No. 3267.

District Court, W. D. Pennsylvania.

Jan. 8, 1942.

Richey & Watts and H. F. McNenny, all of Cleveland, Ohio, and Wm. I. King, of Pittsburgh, Pa., for plaintiff.

Stebbins & Blenko and William H. Webb, all of Pittsburgh, Pa., for defendant.

McVICAR, District Judge.

After hearing, the Court makes the following findings of fact and conclusions of law:

### Findings of Fact.

1. This is an action to recover damages and for injunctive relief by reason of alleged infringement by defendant of Kathner method patent 1,810,612 and Kathner Reissue patent 17,413.

2. Plaintiff, the Duraloy Company, is a corporation and citizen of the State of Delaware. The defendant, the Carnegie-Illinois Steel Company (successor to the American Sheet & Tin Plate Company) is a corporation of the State of New Jersey.

### Kathner Patent 1,810,612.

3. Arthur T. Kathner filed his application in the office of the Commissioner of Patents of the United States, February 9, 1929, for a method of heat treating metal. June 16, 1931, patent 1,810,612 was granted to said Kathner.

4. The process of Kathner Patent 1,-810,612 embodies steps for normalizing low carbon sheet steel. The process produces a double refinement of the grains of the steel by recrystallizing the steel into austenite during heating and recrystallizing the austenite into ferrite and eutectoid on cooling develops ductility and softness suitable for deep drawing operations without further treatment; develops a high degree of uniformity in ductility, softness and grain size throughout each sheet and throughout successive sheets treated; frees the steel of transformation stresses and prevents supersaturation of carbon

in the ferrite, thereby avoiding quench aging or the loss of ductility and softness with the passage of time.

5. This patent had a limited commercial success.

6. July 23, 1929, Kathner, in writing, granted to the Duraloy Company, plaintiff, the exclusive license to make, use and sell apparatus embodying and to practice the inventions and improvements described in patent 1,810,612, also, in his Reissue patent No. 17,413, with the right to the Duraloy Company to sue and collect for infringement of said patents. This action was brought January 28, 1937.

7. Patent No. 1,810,612 contains three claims. Claim 2 is an example claim and reads as follows:

"The herein described method of heat treating steel which resides in passing low carbon steel continuously and in the presence of non-oxidizing gases through communicating heating and cooling zones of a furnace, heating the steel in the heating zone to a temperature above the upper critical temperature range of the steel and between about 1600 degrees F., and 1950 degrees F., cooling the steel in the cooling zone to about a dull red heat, discharging the steel from the furnace at such a temperature that the steel will have reached about a black heat when discharged into the open air, and controlling the speed of travel of the steel thru the said zones so that the time consumed by the steel in passing thru the cooling zone is approximately one half of the time consumed in passing thru the furnace."

8. The Weirton Steel Company built a furnace according to Kathner's design and method, which was put into commercial operation by that Company on or about January 1, 1927, more than two years prior to the filing date (February 9, 1929) of the Kathner patent 1,810,612 in suit. The method of normalizing low carbon steel sheets as claimed in patent 1,810,612, was publicly and commercially used in the normalizing of several hundred tons of low carbon steel sheets prior to February 9, 1927.

9. "Normalizing" low carbon steel sheets consists in heating them above the upper critical temperature (about 1620 degrees F.), holding at this temperature for a time and then cooling fairly rapidly. Normalizing low carbon steel sheets to produce a tough, fine grain steel for deep drawing purposes had been known and practiced for many years prior to the application of Kathner for the above patent.

10. Scaling of heated steel sheets could be prevented by cooling the sheets in a non-oxidizing atmosphere to a non-scaling temperature of about a dull red or black heat before discharging them into the open air.

11. Prior to about 1924, low carbon sheets for deep drawing purposes were normalized in normalizing furnaces from which they were discharged into the open air. While this produced some scaling of the surfaces, such sheets met the requirements of the art at that time.

12. In about 1924 or 1925, the automobile industry began demanding not only a tough deep drawing steel sheet but also one having a smooth finish. This demand was met prior to the Kathner patents by steel manufacturers, by adding to the old normalizing furnaces cooling chambers in which the steel sheets were cooled in a non-oxidizing atmosphere to a non-scaling temperature (dull red or black heat) before the sheets were discharged into the open air.

13. In 1925 Otis Steel Company constructed a normalizing furnace known as the No. 1 furnace having aligned, communicating heating and cooling chambers of approximately the same length. This furnace was used commercially for the normalizing of low carbon steel sheets substantially continuously from July 1925 until November 1928. Such sheets were passed continuously and in the presence of non-oxidizing gases through the heating and cooling chambers and were heated to above the upper critical temperature in the heating chamber and cooled in the cooling chamber and discharged therefrom at about a black heat and at times at a very dull red heat. The speed of travel of the sheets was the same in the heating and cooling zones so that they were in the cooling chamber slightly longer than in the heating chamber. The sheets as discharged from the furnace were pack cooled.

14. The product of the No. 1 Otis furnace was normalized sheets having fine grain, good drawing qualities and uniformity of physical characteristics and these sheets were used in the automobile trade for deep drawing and extra deep drawing purposes and met the requirements of the trade.

15. In 1926 the Otis No. 2 furnace, having a heating chamber 60 feet long and a cooling chamber 40 feet long, was constructed and placed in commercial production of normalized low carbon sheets. The same normalizing practices were carried out in this furnace. The sheets were discharged at a dull red or a black heat. There was no difference between the product of this furnace and the No. 1 furnace.

16. In 1924, the Sharon Steel Hoop Company used commercially in the normalizing of low carbon steel sheets, a furnace having a 30 foot heating chamber and an enclosed cooling chamber formed by covering the run-out table at the end of the heating chamber. This cooling chamber was about 45 feet long. This furnace had a fire wall and an adjustable door between the heating and cooling chambers and conveying mechanism in both. The sheets were passed continuously and in the presence of non-oxidizing gases through the heating and cooling chambers, were heated above the upper critical temperature, and discharged from the cooling chamber at temperatures ranging from a black to a dull red heat. The sheets were pack cooled.

17. In January 1925, the furnace was modified to provide both the heating and cooling chambers within the furnace proper. The length of the cooling zone was varied by shutting off some of the burners at the discharge end thereof. In some regular commercial operations they were shut off so that the heating and cooling zones were of substantially equal lengths. In regular commercial production in 1925 and subsequently, low carbon sheets were passed continuously and in the presence of non-oxidizing gases through the heating and cooling zones, were heated above the upper critical temperature, and were discharged at temperatures varying from a black to a dull red heat. The sheets were pack cooled.

18. A furnace known as the No. 6 furnace was built by Sharon Steel Hoop Company and placed in operation in May, 1926. This furnace was used thereafter both for normalizing and for annealing low carbon sheets for deep drawing purposes. The burners on this furnace were manipulated to shorten the heating chamber and lengthen the cooling chamber in normalizing operations. The sheets were discharged from this furnace somewhat hotter than on the lengthened furnace. The sheets were pack cooled.

19. Swindell Brothers & Company, in 1925, built a furnace for Pittsburgh Cold Rolled Steel Company, in which low carbon steel strip was normalized. A copper coating was applied to the strip which was passed through the heating chamber and the copper coating was fused to the strip, and the strip was normalized by being heated above the upper critical temperature. The strip was then cooled in a closed cooling chamber while still subjected to a non-oxidizing atmosphere to a dead black heat.

20. The Ruder patent 1,156,496 discloses a furnace for heat treating steel sheets in a non-oxidizing atmosphere and having a cooling chamber approximately of the same length as the heating chamber. The heating temperature specified by Ruder is definitely a normalizing temperature. The Ruder patent discloses the application of his furnace to the heat treating of silicon steel sheets. Silicon steel sheets and low carbon steel sheets "are not so different in contents or properties that its prior use on one of them is not a valid reference against patentability in its application to the other."

21. The Marsh & Cochran patent 1,-610,567 discloses two processes: (1) a process of normalizing steel sheets in which the sheets are passed through heating and cooling zones of a furnace, are heated in the heating zone to a temperature above the upper critical point, and are cooled in the cooling zone to a non-scaling or dull red heat at a temperature of 1200 to 1400 degrees F., discharged into the open air, piled in packs and allowed to cool slowly in packs; (2) essentially the same process but the cooling time in the furnace is prolonged so that the sheets issue into the air at a dead black heat of approximately 400 degrees F.

22. The Marsh & Cochran patent No. 1,610,567 was the principal prior art reference relied upon by the Patent Office in the prosecution of the application for the Kathner patent No. 1,810,612, and the claims in suit were allowed over Marsh & Cochran by a Board of Appeals in the Patent Office, consisting of an assistant commissioner and two examiners in chief.

23. There is no patentable distinction between the process claimed in the Kathner patent No. 1,810,612 and the prior practice

294

at Otis Steel Company, the prior practice of the Sharon Steel Hoop Company, the prior practice of the Pittsburgh Cold Rolled Steel Company, and the method disclosed in the Ruder patent 1,156,496 and the Marsh & Cochran patent 1,610,567.

24. Patent 1,810,612 is invalid.

25. The defendant's Vandergrift furnace has a heating chamber 85 feet long and a cooling chamber 70 feet long. The sheets are discharged from the furnace in normal operation at a temperature above 1300 degrees C. The sheets, as discharged from the furnace, are piled and allowed to slowly cool in packs. Defendant's Mercer-Gary furnace complained of, has a heating zone 75 feet long and a cooling zone 76 feet long. The sheets are discharged from the furnace in normal operation at a temperature of about 1200 degrees and above, usually above 1200 degrees. The sheets are piled and allowed to slowly cool in packs.

26. The evidence concerning the defendant's Wood Works furnaces at McKeesport is vague, indefinite and insufficient for a finding of fact as to their operation.

27. The defendant's process in which the sheets are discharged from the furnace at temperatures of 1200 degrees and above, and are then allowed to cool in packs, more closely resembles the processes of the prior art, such as those of Otis Steel Company and Sharon Steel Hoop Company and the Marsh & Cochran patent 1,610,567, than it does the Kathner method patent in suit, 1,810,612.

28. The defendant's processes at the furnaces complained of by plaintiff, do not infringe patent 1,810,612.

29. Plaintiff inspected defendant's Vandergrift and McKeesport furnaces in March 1930. Defendant's patent 1,810,612 was granted June 16, 1931. This action was brought January 28, 1937.

Reissue Patent No. 17,413.

30. Original patent 1,669,902, dated May 15, 1928. Application for reissue was filed May 10, 1929 and was reissued August 20, 1929 as Reissue 17,413.

31. This Reissue patent reads: "This invention relates broadly to furnaces for annealing and heat treating metals, and more specifically to a furnace for normalizing, annealing, heat-treating and processing metal sheets, plates, slabs, bars and the like."

32. This patent recites that:

"The primary object of the invention is to provide a continuous furnace of multiple type adapted to meet the various peculiar requirements involved in the treatment and processing of metals whereby the latter may be given practically any required character or quality obtainable through heat treatment. More specifically stated, it is designed that the furnace may be employed economically for effecting any and all of the annealing, normalizing and processing operations required to impart to the metal the characteristics which are desired and which are obtainable by or through heat treatment which operations have heretofore been effected only by the employment of numerous different forms or types of furnaces.

"A further object is to provide a continuous furnace of the character referred to having certain improved features of constructions providing for regulation of the temperature and the rate of cooling required to produce any desired character of annealing and whereby a material economy in the time involved in the treatment or processing of the metal may be effected."

33. This patent discloses a normalizing furnace embodying the combination of removable bungs embodying roof and upper side wall portions with lower side walls supporting conveyor shafts so that a bung may be lifted to give access to any desired shaft for repair or replacement and the bungs may be removed or rearranged on the lower side walls to adapt the furnace to carry out any desired heat treating process.

34. This patent contains seventeen claims. Kathner disclaimed the subject matter of Claims 15 and 17 of this patent after the decision of the Sixth Circuit Court of Appeals in the case of Duraloy Company v. Surface Combustion Company, 75 F.2d 305. Plaintiff did not file a disclaimer as to the subject matter of Claim 16 of said patent. Claim 16 is not definitely distinguishable from Claims 15 and 17.

35. The claims in suit of the Reissue patent cover nothing more than an aggregation of features of furnace construction which were old and well known in the furnace art.

36. Reissue patent 17,413 is invalid.

37. Defendant has a license from plaintiff to construct and operate a furnace in conformity to Reissue patent 17,413. The furnace constructed and operated by defendant under said license was moved by the defendant from its Mercer plant to its Gary plant. In the moving, defendant did not change the identity of the furnace, but made only such repairs and replacements as were necessary to place the furnace in good, operating condition.

38. Defendant has not infringed Reissue patent 17,413.

### Conclusions of Law.

I. The claims of Kathner patent 1,810,-612 are invalid because the method therein defined was in public use more than two years prior to the filing of the application for said patent.

II. The Kathner method patent 1,810,-612 is anticipated by the Otis Steel Company, Sharon Steel Hoop Company and Pittsburgh Cold Rolled Steel Company prior uses, and by the Ruder patent 1,156,-496 and the Marsh & Cochran patent 1,610,-567.

III. The claims of Kathner patent 1,810,-612 are invalid.

IV. Defendant's practice at its furnaces at Vandergrift and Gary do not infringe Kathner patent 1,810,612. The practice both at Vandergrift and Gary is substantially identical with the prior art. Defendant has not infringed patent 1,810,612.

V. Defendant has not so changed the identity of the Mercer-Gary furnace as to remove it from the protection of the license granted defendant covering this particular furnace when it was built.

VI. Defendant has not infringed Reissue patent 17,413.

VII. The Kathner Reissue 17,413 is invalid for failure to have disclaimed Claim 16 along with Claims 15 and 17.

VIII. The claims of Kathner Reissue 17,413 are anticipated by the prior uses at Otis and at Sharon and by the prior patents which show the structural details embodied in the Reissue.

IX. Judgment should be entered in favor of defendant with costs.

### Opinion.

This is an action to recover damages and for injunctive relief for alleged infringement of Kathner patent 1,810,612 and Kathner Reissue patent 17,413. The issues as to both patents are validity and infringement.

### Patent 1,810,612.

Application for a patent containing a method of heat treating metal was made by Arthur T. Kathner February 9, 1929. Patent was granted June 16, 1931. This action was brought January 28, 1937. This patent recites:

"The primary object of the invention is to greatly or materially reduce the time cycle in processing the metal, for example, heretofore in box annealing two to three days per box have been required to properly anneal, whereas with the present invention an equal amount of annealing has been accomplished in two hours.

"An important object of the invention is to reduce the time and temperatures employed in the subsequent processes of heat treating whereby to obtain a softer sheet and to reduce the number of processing steps through the mill."

This patent contains three claims. Claim 2 is an example claim and reads:

"The herein described method of heat treating steel which resides in passing low carbon steel continuously and in the presence of non-oxidizing gases through communicating heating and cooling zones of a furnace, heating the steel in the heating zone to a temperature above the upper critical temperature range of the steel and between about 1600 degrees F., and 1950 degrees F., cooling the steel in the cooling zone to about a dull red heat, discharging the steel from the furnace at such a temperature that the steel will have reached about a black heat when discharged into the open air, and controlling the speed of travel of the steel thru the said zones so that the time consumed by the steel in passing thru the cooling zone is approximately one half of the time consumed in passing thru the furnace."

The process of this patent embodies steps for normalizing low carbon sheet steel. The process produces a double refinement of the grains of the steel by recrystallizing the steel into austenite during heating and recrystallizing the austenite into ferrite and eutectoid on cooling develops ductility and softness suitable for deep drawing operations without further treatment; develops a high degree of uniformity in ductility, softness and grain

size throughout each sheet and throughout successive sheets treated; frees the steel of transformation stresses and prevents supersaturation of carbon in the ferrite, thereby avoiding quench aging or the loss of ductility and softness with the passage of time.

This patent is invalid for several reasons, two of which I shall discuss herein:

The Weirton Steel Company built a furnace according to Kathner's design which was put into commercial operation by that Company on or about January 1, 1927, more than two years prior to the filing date (Feb. 9, 1929) of patent 1,810,612. The method of normalizing low carbon steel sheets as claimed in patent 1,810,612, was publicly and commercially used in the normalizing of several hundred tons of low carbon steel sheets prior to February 9, 1927.

█ R.S. § 4886, 35 U.S.C.A. § 31, provides that any person who has invented or discovered any new and useful art, machine, manufacture or composition of matter may obtain a patent therefor, if the subject matter of the invention or discovery has not been "in public use or on sale in this country for more than two years prior to his application." In Electric Storage Battery Co. v. Shimadzu et al., 307 U.S. 5, 12, 613, 616, 59 S.Ct. 675, 680, 83 L.Ed. 1071, the Supreme Court stated:

"The last sentence of the paragraph expressly preserves the bars of more than two years' prior patenting, description in a printed publication before the filing of application in this country, and public use, more than two years before such filing."

The process of patent 1,810,612 was in public use in this country more than two years prior to the application therefor; it follows, therefore, that the claims of this patent are invalid.

█ Patent 1,810,612 is anticipated by the Otis Steel Company, Sharon Steel Hoop Company and Pittsburgh Cold Rolled Steel Company prior uses, and by the Ruder patent 1,156,496 and the Marsh & Cochran patent 1,610,567. The facts relating to the prior uses and prior patents referred to, are set forth in the foregoing findings of fact and it is not necessary that the same be repeated here.

█ Defendant's process, complained of by plaintiff, does not infringe patent 1,810,-612. In defendant's furnaces the sheets are discharged from the furnace at temperatures of 1200 degrees and above, and are then allowed to cool in packs, which process more closely resembles the processes of the prior art such as those of the Otis Steel Company, the Sharon Steel Hoop Company and the Marsh & Cochran patent 1,610,567, than it does the method of patent 1,810,612.

### Reissue Patent 17,413.

Original patent 1,669,902 is dated May 15, 1928. Application for reissue was filed May 10, 1929. It was reissued August 20, 1929, as Reissue patent 17,413. This action for infringement thereof was brought January 28, 1937.

Reissue patent 17,413 recites: "This invention relates broadly to furnaces for annealing and heat treating metals, and more specifically to a furnace for normalizing, annealing, heat-treating and processing metal sheets, plates, slabs, bars and the like."

The patent further recites:

"The primary object of the invention is to provide a continuous furnace of multiple type adapted to meet the various peculiar requirements involved in the treatment and processing of metals whereby the latter may be given practically any required character or quality obtainable through heat treatment. More specifically stated, it is designed that the furnace may be employed economically for effecting any and all of the annealing, normalizing and processing operations required to impart to the metal the characteristics which are desired and which are obtainable by or through heat treatment which operations have heretofore been effected only by the employment of numerous different forms or types of furnaces.

"A further object is to provide a continuous furnace of the character referred to having certain improved features of constructions providing for regulation of the temperature and the rate of cooling required to produce any desired character of annealing and whereby a material economy in the time involved in the treatment or processing of the metal may be effected."

This patent contains seventeen claims.

Defendant constructed a furnace under this patent at its Mercer plant. It afterwards removed this furnace from Mercer to Gary. Defendant did not change the identity of the furnace but made only such

repairs or replacements as were necessary to place the furnace in good, operating condition. The original cost of the furnace was approximately $100,000. The charge made to the defendant's plant at Gary for this furnace was $87,259.03. The refractories and insulation were not sent to Gary because it is difficult to remove refractory brick work—breakage is encountered in such an effort, and the cost of transportation will not warrant the change. These same factors apply to insulation. The piping on the furnace at Mercer was not removed for similar reasons. Some additional burners were added to the furnace at Gary for the purpose of increasing the capacity and improving the quality and uniformity of the heating, the cost of which was less than $500. Every new item of importance which went into the Gary furnace was for the purpose of repairing wornout parts of the furnace. Disks, shafts, filler rings, bushings, castings and refractories are all things which normally wear out in the use of a furnace and have to be replaced from time to time. The cost of the new parts amounted to $11,628.19. The repair items, other than new parts, cost a little over $5,000. The identity of the furnace was not changed and such repairs and replacements were necessary to put the furnace in good, operating condition.

In Wilson v. Simpson, 9 How. 109, 122, 123, 13 L.Ed. 66, the Supreme Court stated:

"We admit for such is the rule in Wilson v. Rousseau, 4 How. 646, 11 L.Ed. 1141, that when the material of the combination ceases to exist, in whatever way that may occur, the right to renew it depends upon the right to make the invention. If the right to make does not exist, there is no right to rebuild the combination.

"But it does not follow, when one of the elements of the combination has become so much worn as to be inoperative, or has been broken, that the machine no longer exists, for restoration to its original use, by the owner who has bought its use. When the wearing or injury is partial, then repair is restoration, and not reconstruction.

"Illustrations of this will occur to anyone, from the frequent repairs of many machines for agricultural purposes. Also, from the repair and replacement of broken or worn-out parts of larger and more complex combinations for manufactures.

"In either case, repairing partial injuries, whether they occur from accident or from wear and tear, is only refitting a machine for use. And it is no more than that, though it shall be a replacement of an essential part of a combination. It is the use of the whole of that which a purchaser buys, when the patentee sells to him a machine; and when he repairs the damages which may be done to it, it is no more than the exercise of that right of care which every one may use to give duration to that which he owns, or has a right to use as a whole."

See, also, Cinema Patents Co. v. Craft Film Laboratories, Inc., D.C., 56 F.2d 265, affirmed by the Third Circuit Court of Appeals in 64 F.2d 42.

■ I conclude under the facts and the law, that the furnace removed from Mercer to Gary remained under the original license, and consequently, that defendant has not infringed plaintiff's patent 17,413 in the operation of said Gary furnace.

■ Defendant, by reason of said license, is estopped from denying the validity of patent 17,413. However, I have found that said patent is invalid for several reasons, one of which only, I will discuss:

■ This patent is invalid by reason of the failure to disclaim Claim 16 along with Claims 15 and 17. Claims 15 and 17 were involved in the case of Duraloy Company v. Surface Combustion Company, 6 Cir., 75 F. 2d 305. These claims were held invalid. The final decree was entered April 6, 1935. May 16, 1935, Kathner filed a disclaimer in the Patent Office of Claims 15 and 17, as covering subject matter of which "said patentee was not the first inventor." Claim 16 was not disclaimed. In Maytag Co. v. Hurley Machine Co. et al., 307 U.S. 243, 59 S.Ct. 857, 859, 83 L.Ed. 1264, the Supreme Court stated:

"There has been unreasonable neglect or delay in entering a disclaimer of claim 39 within the meaning of R.S. § 4917 [35 U.S.C.A. § 65], and R.S. § 4922 [35 U.S.C.A. § 71], unless that claim is 'definitely distinguishable from the parts claimed without right',—that is, the disclaimed method claims 1 and 38. This must be so, for the company, by disclaiming those claims, has confessed that the patentee therein claimed 'more than that of which he was the original or first inventor or discoverer' and that the company, as assignee of the patent, therefore, 'did not choose to claim or to hold' the method therein disclosed 'by virtue of the patent or assignment.'"

See Edwin L. Wiegand Company et al. v. Harold E. Trent Company, 3 Cir., 122 F.2d 920.

The subject matter of Claim 16 is not definitely distinguishable from Claims 15 and 17. Everything which is claimed in Claim 16 is set forth in practically identical language in Claims 15 and 17. The only difference between Claim 16 and Claims 15 and 17 is that in Claim 16 it is stated that the restricted passage is "adjustably controlled." There is nothing in the specification which indicates that the patentee intended the restricted passage to be otherwise than "adjustably controlled." The mere statement that the restricted passage is "adjustably controlled" does not differentiate Claim 16 in either operation or result from Claims 15 and 17.

Let an order for judgment be prepared and submitted in accordance with the foregoing findings of fact, conclusions of law and this opinion.