**FIRESTONE TIRE & RUBBER CO. v. UNITED STATES RUBBER CO.**

**UNITED STATES RUBBER CO. v. FIRESTONE TIRE & RUBBER CO.**

Nos. 6917, 6918.

Circuit Court of Appeals, Sixth Circuit.

Oct. 10, 1935.

Rehearing Denied Dec. 9, 1935.

950

Arthur C. Denison, of Cleveland, Ohio, and Albert L. Ely, of Akron, Ohio (Frank O. Richey, of Cleveland, Ohio, on the brief), for Firestone Tire & Rubber Co.

Merrell E. Clark, of New York City (Newton A. Burgess and E. Clarkson Seward, both of New York City, and Fay, Oberlin & Fay, of Cleveland, Ohio, on the brief), for United States Rubber Co.

Before MOORMAN, HICKS, and SIMONS, Circuit Judges.

SIMONS, Circuit Judge.

The suit below was for infringement of certain of the claims of each of a group of seven patents, which together are claimed to dominate and control the so-called drum process of building the outer casings of automobile tires. The plaintiff prevailed in many of its contentions as to validity and infringement, but failed in others, and both litigants have appealed; 6917 being the appeal of the defendant Firestone, and 6918 being the cross-appeal of the plaintiff United States Rubber Company. The patents involved, the claims in suit, and the results below, follow:

Hopkinson, No. 1,374,505, April 12, 1921. Claims 2, 9, 15, 16, 18, 23, and 27; all held valid and infringed.

Gammeter, No. 1,480,719, January 15, 1924. Claims 1, 2, 17, 18, and 19; all held valid and infringed.

Abbott, No. 1,507,563, September 9, 1924. Apparatus claims 11, 23, and 31 held valid and infringed. Process claims 1, 2, 6, 7, and 32 held invalid.

Sloper process patent, No. 1,372,567, March 22, 1921. Claims 2, 3, and 4; held valid but not infringed.

Sloper apparatus patent, No. 1,487,033, March 18, 1924. Claims 1, 2, 3, 4, 6, 7, 8, and 14; all held valid but not infringed.

Lough, No. 1,607,266, November 16, 1926. Claim 3; held valid and infringed.

Hopkinson reissue, No. 17,618, March 4, 1930. Claims 13, 14, 15, 16, 17, 18, 19, 21, 24, and 25; all held invalid.

The Hopkinson patent, No. 1,374,505, is claimed to be basic in relation to the present method of building automobile tires, the others (save Lough) being either for improvements therein or for apparatus by which it is now commercially practiced in the industry.

Prior to Hopkinson, automobile tire casings had been fashioned by what is called.

the core process. The usual and desirable limits of an opinion will not permit a detailed description of this earlier method of tire making. Perhaps it is sufficient to say that in the core process the casing or carcass, consisting of a number of plies of bias-cut fabric impregnated with rubber, a tough rubber tread, an open mesh fabric breaker strip, and a soft rubber cushion, was built up upon a shaped metal core corresponding to the cavity of the finished tire. As the core was revolved, the fabric followed its contour at and near the tread, but the portions of the band which were to constitute the side and bead portions of the tire being longer circumferentially, required a stitching down by means of wheels or disks so as to adhere smoothly to the sides of the core. Inextensible bead wires were applied in their final position and the edges of the fabric plies folded around them, likewire by the use of suitable stitchers. The tire in substantially its ultimate form was then removed from the core, which could be collapsed for the purpose, and was ready for the final step of vulcanization. It is conceded that the core process produced extremely satisfactory and durable tires, but asserted that it required skilled operators, and was tedious and expensive.

What Hopkinson claims to have contributed to the industry is a method of winding multiple plies of tire fabric upon a flat drum of a diameter corresponding to the bead or smallest diameter of the tire, applying the cushion, breaker strip, tread, and side walls to this fabric while still upon the drum, thereby producing a complete tire structure in flat "pulley band" form, and thereafter converting the band into a torus shaped tire without rupturing the fabric of the carcass or tearing it away from the beads. The shaping is done by distending the tread portion of the pulley band and simultaneously moving the bead portions toward each other without imposing any appreciable stress upon the cord elements of the fabric. While held in this distended position, either by mechanical or fluid pressure, the tire carcass is then vulcanized. Saving of labor and material, and a more standardized product, are claimed to be due to this process.

While the Hopkinson patent disclosed both process and apparatus, the latter never came into commercial use, and the process claims are alone in suit. Revolutionary effect upon the industry is asserted for these claims, evidenced by universal adoption of the process by tire makers and an acknowledgment of validity by the acceptance of licenses on the part of nearly all manufacturers other than the defendant. The defenses are anticipation by prior disclosures and practices, and noninfringement.

Of the claims in suit, 2, 9, and 15 cover generally the drum process for the building of the pulley band; 16 and 18 specify the use of internal fluid pressure in shaping the pulley band; and 23 and 27 extend to the narrowing of the pulley band in shaping to allow for its circumferential expansion. Claim 2 is sufficiently illustrative of the first group of claims, and is printed in the margin.[1] Claim 9 is similar, except that it adds the step of applying the tread rubber in the building of the band, and claim 15 adds the steps of applying the cushion and the breaker strip.

Generally speaking, all of the claims in issue cover a method for making a tire casing by first building its elements into pulley band form and then shaping to tire form by distending the band at its center and bringing the edges toward each other. In its broader aspect, extravagant claims are made for the originality and inventive genius displayed in achieving the Hopkinson result. The modern automobile tire is of heavy, stiff construction, and to the uninitiated the shaping of the heavy barrel-like pulley band which results from the super-imposing of many layers of rubberized fabric one upon the other, adding breaker strip, cushion rubber, and heavy tread rubber, applying inextensible wire beads, and then shaping this cumbersome structure to tire form by fluid pressure without injury to the materials, would seem at first glance a highly significant advance in the art of tire building, especially when

---

1 2. In the method of making a tire casing for motor vehicles the steps of superposing a plurality of previously formed strips of rubberized fabric to form an unvulcanized multi-ply pulley band with its edge portions substantially in the plane of the pulley band, applying a retaining member to each of said edge portions, giving tire form to the pulley band before vulcanization by distending the central portion and causing the edge portions to move toward each other and in such movement to turn from the plane of the pulley band to substantially final position substantially at right angles to said plane and extending toward the center of the casing, while maintaining the order of the plies, and finally vulcanizing.

952

viewed in the light of evidence apparently indicating general acceptance of the method by the industry. But in this as in all cases where invention or the scope of a patent is to be determined, it becomes necessary to ascertain from the standpoint of one skilled in a particular art the precise advance made by the inventor [Adams v. Galion Iron Works & Mfg. Co., 42 F.(2d) 395, 397 (C. C. A. 6)], and prior art more often discloses the gradual evolution of a concept than its springing fully matured from the brow of genius.

Hopkinson was not the first to wind fabrics flatly upon a drum instead of a core in the manufacture of casings for pneumatic tires. Doughty, in the building of bicycle tires for the Dunlop Company in 1898, undoubtedly wound his casing fabric on a flat drum, and had taken a patent on apparatus for the purpose, while Tew (patent No. 1,242,073, October 2, 1917) disclosed a method of building automobile tires by first fabricating the pulley band of layers of fabric so wound. Harris (patent No. 1,162,479, November 30, 1915) likewise disclosed drum winding, although in other respects Harris may not be regarded as anticipating Hopkinson. Doughty is challenged as a reference, both on the ground that his patent was for apparatus and not for a process, and on the ground that bicycle tires are not automobile tires; the difference between them being not of degree but of kind. Doughty, however, actually practiced the method of drum winding and shaping which is relied upon by the defendant as an anticipation for a number of years in the United States.

█ The Doughty use is not to be disposed of by the mere contention that his practice was in the manufacture of bicycle tires while the Hopkinson patent discloses a process for the manufacture of automobile tires. The pneumatic motor vehicle tire is undoubtedly the lineal descendant of the earlier bicycle tire, Dunham Co. v. Cobb, 19 F.(2d) 328 (C. C. A. 6); Page Steel & Wire Co. v. Smith Bros. Hardware Co., 64 F.(2d) 512 (C. C. A. 6), and there is a close family resemblance. Each consists of an outer casing formed of bias cut woven fabric, with heavier tread rubber and retaining beads attached, and open partially or wholly at its rim seating inner circumference to receive the inflatable inner tube. Intermediate the two, and in a sense the missing link, is the motorcycle tire, stiffer and heavier than the bicycle tire, but lighter than the automobile tire, although the earliest automobile tires were undoubtedly of lighter construction than present motorcycle tires. Some of the automobile tire makers, whatever later changes may have taken place in corporate organization and style, have evolved from the earlier bicycle tire industry, notably the very plaintiff herein, a fact of common knowledge that we may note. Indeed, the dependence of the rubber tire industry, in its present motor vehicle phase, upon knowledge and experience gained in a bicycle era, has received substantial judicial recognition. John E. Thropp's Sons' Co. v. Seiberling, 264 U. S. 320, 324, 44 S. Ct. 346, 349, 68 L. Ed. 708; Republic Rubber Co. v. G. & J. Tire Co., 212 F. 170 (C. C. A. 7); Republic Rubber Co. v. Morgan & Wright, 197 F. 549, 552 (C. C. A. 2).

█ Notwithstanding this relationship, similarity of materials employed, and the needs to be served, it yet seems a far cry, as one views the physical exhibits, from the comparatively light and flexible casing of the bicycle tire to the sturdy, cumbersome casing of the automobile tire. We must not, however, be misled by mere disparity of weight and dimensions. As we have said in a recent case [A. O. Smith Corporation v. Petroleum Iron Works Co., 73 F.(2d) 531, 535], receiving the tribute of quotation from each of the present litigants, "While we recognize that the fabrication of structures of unusual dimensions may often present problems not present in smaller structures and not within the reach of the skilled mechanic, and that in their solution the inventive genius may be exercised, yet it has become sufficiently axiomatic to warrant dispensing with citation that a mere change in proportions, without more, does not amount to invention." See Newton Steel Co. v. Surface Combustion Co., 75 F.(2d) 305, 308 (C. C. A. 6). We must assume that if Hopkinson did nothing more than apply the process practiced by Doughty and suggested by his patents to the manufacture of tires of greater size, weight, and thickness, there could be no invention in the method disclosed, for the mere adaptation of a known process to a clearly analogous use is not invention, Pennsylvania R. Co. v. Locomotive Engine Safety Truck Co., 110 U. S. 490, 494, 4 S. Ct. 220, 28 L. Ed. 222, and it becomes necessary to review the Doughty practice and to analyze the steps of the Hopkinson method to see what advance the latter made up--

on the former, whether such advance denotes the exercise of the inventive faculty or fails so to do, and if validity may be found or conceded, the scope that is to be given to the claims upon the issue of infringement.

Doughty provided a flat drum and wrapped about it two layers or plies of rubberized fabric. Wire beads were then placed about the fabric, and the edges of the fabric turned over the beads. The tread rubber was applied and rolled in place, the band removed from the drum and placed over a mechanically expansible core for expanding the center of the band outwardly, with the result that the edges of the band closed in around the core. The band held in its expanded condition was then placed in a mold and vulcanized. That in so far as has been considered the Hopkinson patent reads upon the Doughty process, cannot be disputed, and the master, who held claims 2, 9, and 15 valid over Doughty, so found. But Hopkinson added other steps to the Doughty process, and if these are new, either singly or in combination, and denote invention, the fact that some steps were well known in the art will not defeat a holding of validity. Doughty used square woven fabric. That this fabric is extensible longitudinally when cut upon the bias is well known. When a fabric is stretched in one diagonal direction, its square meshes become diamond shaped, with the length of the diamond along the line of stretch. This produces a contraction of the fabric in the line of its width. It is "a quality which all woven material has had since weaving was known; i. e., that it will contract in one direction as it stretches in another." Firestone Tire & Rubber Co. v. Seiberling, 257 F. 74, 76 (C. C. A. 6); John E. Thropp's Sons' Co. v. Seiberling, supra. See, also, Forchheimer v. Franc, Strohmenger & Cowan, 20 F.(2d) 553 (C. C. A. 6). Hopkinson uses cord fabric. For Doughty's process, however, the extensibility of bias cut woven fabric was sufficient. That which quite clearly turned the scales in favor of validity in the court below, and which is most insistently urged here as constituting Hopkinson's inventive concept, is that cord fabric is of far greater extensibility than square mesh fabric, and that the essential difference between Hopkinson and Doughty grows out of the former's recognition of cord action. The master concluded and the court agreed that what Hopkinson saw,

which Doughty did not, was that bias-cut cord fabric properly disposed in pulley band form could be distended to any necessary desired dimension, retaining in the process its peculiar fitness for the duty it must perform in the finished tire.

But cord fabric was not the discovery of Hopkinson, nor was he the first to recognize that the extension of such fabric when cut on the bias results in a rearrangement of the cords rather than in their stretching to the point of weakening. Cord fabric was used in the making of automobile tires, and its attributes fully understood, even before the patent to Litchfield, No. 943,358, December 14, 1909. We so found in Goodyear Tire & Rubber Co. v. Michelin Tire Co., 18 F.(2d) 216, where it was noted that before 1909 the art had begun to use a quasi fabric in which the threads running in one direction were much enlarged and called cord, while those in the opposite direction were minimized so that they merely held the cords in position. This was to permit the necessary shaping, the cords being made diagonal to the tire. If Hopkinson did nothing more than to substitute one known material for another in the same or an analogous art, he did nothing more than what was to be expected of those skilled in the art, Kemper-Thomas Co. v. J. P. Gordon Co., 67 F.(2d) 478, 480 (C. C. A. 6); Lovell Mfg. Co. v. Cary, 147 U. S. 623, 13 S. Ct. 472, 37 L. Ed. 307; Newton Steel Co. v. Surface Combustion Co., supra, and this is not invention. It is interesting to note that the master in his able report considered that the Doughty use would have invalidated the Hopkinson claims in issue if Doughty had used the more extensible cord fabric, even though Doughty might not have recognized as Hopkinson did the action of the threads of this fabric which would have permitted a greater extension of the tire band. Yet when the master came to consider anticipation by a certain prior use of one Dykes upon an assumption in his draft report that the Dykes method had been reduced to practice (an assumption later rejected upon new evidence), he concluded that the advance made by Hopkinson in adapting the method of Dykes to the use of cord fabric in the light of the art was only that progress in the art which might reasonably be expected, and did not rise to the dignity of invention. It is important also to note that the claims are not limited to cord fabric, and that the specifi-

cation suggests availability of the process when woven fabric is employed.

■ The fact that neither Doughty nor his employers, the Dunlop Company, used the Doughty process in the manufacture of Dunlop automobile tires, but followed universal practice in building the tire carcass on a core, is, of course, important, but not controlling. Many reasons present themselves to explain delay or failure in adopting a method, however obvious, which, though promising a better or more economical result, must still replace a demonstrated method satisfactory to the industry at its then stage of development. We are unable to say when in respect to Dunlop's engaging in automobile tire manufacture cord fabric came into use. If earlier, it may still have appealed to reasonable business judgment to follow general practice. If later, replacing expensive machinery and retooling of the plant might not lightly have been undertaken, unless advantage of change promised to be immediately and highly compensatory, and even then availability of capital and reasonable expectation of the industry's stability or expansion were important things to consider. It may also well be that mass production of automobile tires had not yet reached such proportions [2] as to make a comparatively minor saving in labor cost the important consideration that it later became. (A saving of seven to eleven cents per tire is disclosed by the record.) Such possibilities do not destroy the force of the contention asserted, but we think they demonstrate its lack of decisiveness.

■ Important also is the contention, if the fact be true, that general adoption of the Hopkinson process by the industry must turn the scales in favor of validity, if invention be in doubt. If, however, we are correct in our conclusion that in the use of the well-known cord fabric Hopkinson did nothing more than to substitute one known material for another, then his advance over Doughty in respect to the steps so far considered is not invention, and no amount of commercial acceptance for his process will vitalize it with the spark of genius. Commercial success, even if clearly established, may not be controlling, Paramount Publix Corporation v. American Tri-Ergon Corporation, 294 U. S. 464, 55 S. Ct. 449, 79 L. Ed. 997; A. O. Smith Corporation v. Petroleum Iron Works Co., supra, and success is not so established by licenses to competitors when the grants include many patents, some not in suit, when acceptance by a principal competitor is in consideration of tribute to the latter's patents,[3] and the plaintiff is thus left in predominating position toward others in the industry. In such situation "sweeping claims [are] well calculated to induce acquiescence by those without sufficient knowledge of the prior art or adequate capital to resist." John E. Thropp's Sons' Co. v. Seiberling, supra.

Our discussion of the steps in the Hopkinson process up to this point has been with the view of ascertaining not only whether the claims of his patent are valid, but whether if so his combination is entitled to the broad interpretation claimed for it. We have found that he did not originate flat drum winding of bias cut fabric; that if he was the first to make use of cord fabric in the assembly of a pulley band, this was not an inventive step, but merely the substitution of one well-known material for another in an identical or clearly analogous use. But there are other steps in Hopkinson's process; and if singly or in combination with those discussed they present an inventive combination, validity may still appear, with determination as to the breadth of the claims yet to be made by a consideration of the precise advance made over the prior art.

■ The claims recite that the edge portions of the pulley band are substantially in the plane thereof, that the retaining members, or bead wires, are applied to such edge portions, and that the latter are caused to move toward each other in the shaping so as to turn from the plane of the pulley band to substantially final position at right angles thereto, and extending toward the center of the casing. When Hopkinson was before the Patent Office, the Tew patent was called to the attention of the Board of Examiners in interference proceedings then pending. It is unnecessary to detail the entire history of the Hopkinson application, except to say that at one stage of the discussion the Board concluded that certain proposed amendments to the claims

[2] We learned from the Smith Case, supra, that the great increase in gasoline demand came a few years before 1920, and we have little doubt that gasoline and tire demand in some degree follow the same curve.

[3] The plaintiff accepted from Goodrich an exclusive right to grant sublicenses under the Tew and other patents.

did not even prima facie clear them of Tew. The inventor was then given fifteen days within which to overcome the reference, or to propose still further amendments stating that "the retaining members are placed on the outer face of the pulley band." Hopkinson elected to adopt the second recommendation by amending claims 2, 9, and 15 to add thereto the limitation "with its edge portions substantially in the plane of the pulley band, applying a retaining member to each of said edge portions," and this further limitation upon the shaping step, "and in such movement to turn from the plane of the pulley band to substantially final position substantially at right angles to said plane." In pressing the argument for the allowance of the amended claims, Hopkinson urged: "Tew's process involves all the difficulties of spinning down and forming his edge constructions which are inherent in the old method of building on a core. Tew does not have the advantage of Hopkinson or Dykes in starting the formation of his tire from a multi-ply pulley band." In the decision of the Board allowing the amended claims as then presented, it was explained, "Each of the proposed counts differentiates the processes of Dykes and Hopkinson from that of Tew in that it provides that the edges of the pulley band to which the retaining members are applied lie in the plane of the pulley band, i. e., in the cylindrical wall formed by the band and not in an offset therefrom as in the patent to Tew. As Tew, apparently the first to fully disclose the making of a tire casing for motor vehicles by superposing previously formed layers of rubberized fabric into a pulley band and expanding to tire form and vulcanizing, seems to have considered it necessary to apply the retaining members in inturned edges, we are not prepared to hold that the modification of Tew's process which Dykes and Hopkinson may be said to have made was an obvious one." Hopkinson accepted these claims as allowed, and under familiar principles we think is bound by them. Smith v. Magic City Kennel Club, 282 U. S. 784, 51 S. Ct. 291, 75 L. Ed. 707; D'Arcy Spring Co. v. Marshall Ventilated Mattress Co., 259 F. 236, 240 (C. C. A. 6); Directoplate Corporation v. Donaldson Lithographing Co., 51 F.(2d) 199 (C. C. A. 6); Dillon Pulley Co. v. McEachran, 69 F.(2d) 144 (C. C. A. 6). While Patent Office arguments do not create estoppel, they often aid in apprehending disparity between claims presented and those granted.

When we examine the defendant's process it seems to us clear that it followed the Tew rather than the Hopkinson disclosure. The defendant built its pulley band upon a shouldered drum, turning the edges downward rather than building them in the plane of the pulley band, and applied its retaining members to the down turned edges. The master thought this but a colorable departure from Tew on an assumption that the defendant's retaining member is but one-tenth of an inch below the plane of the pulley band. Notwithstanding some ambiguous concession on the part of the defendant's expert, we think this is inaccurate. The drum shoulder is one-half inch in depth, and the beads are one-quarter inch in vertical section. The wire is entirely below the plane of the pulley band. But even if the assumption be correct, in determining departure from the patent or adherence to the teachings of the prior art, we think purpose and function are more persuasive than dimensions, especially when one has so precisely limited his claims to avoid prior art. The shoulder formed by turning down the edges of the defendant's pulley band served, it seems to us, two purposes, each substantial. It provided a stop for the positioning of the wire, and it avoided the necessity of collapsing the drum in order that the retaining members might be put in place. Both purposes were achieved by Tew, and by the defendant. It is the rule that: "Where the claim defines an element in terms of its form, material, location or function, thereby apparently creating an express limitation, where that limitation pertains to the inventive step rather than to its mere environment, and where it imports a substantial function which the patentee considered of importance to his invention, the court cannot be permitted to say that other forms, which the inventor thus declared not equivalent to what he claimed as his invention, are nevertheless to be treated as equivalent." D'Arcy Spring Co. v. Marshall Ventilated Mattress Co., supra, recently cited and approved in R. M. Hollingshead Co. v. Bassick Mfg. Co., 73 F.(2d) 543, 548 (C. C. A. 6).

There is still to be considered the added limitation accepted by Hopkinson whereby in his process the bead edges of the pulley band were caused to turn in shaping from

the plane of the pulley band to final position substantially at right angles to the said plane. It is urged by the defendant that its bead edges do not so turn. We confess inability to understand either its evidence or argument upon this point, especially as we think the claims in this respect describe a necessary result of the shaping step rather than a step in the process. It seems to us inevitable from the shaping operation of both Hopkinson and the defendant for the beads to turn as it would have been in Tew had Tew not thought it of disadvantage and disclosed a way of avoiding it by a preliminary step whereby the beads were placed in final position before shaping.

We have thus far centered our attention primarily on claims 2, 9, and 15. Claims 16 and 18 disclose the steps of shaping the pulley band to tire form by the application of fluid pressure to the inside thereof, and finally vulcanizing. There is nothing more specific in the claims, and they do not differentiate from Tew, who also forms a pulley band from a plurality of fabric plies and brings it to tire shape by fluid pressure applied to the inside thereof. The master concluded that claims 16 and 18 were invalid over Tew, but was overruled by the court, which found the claims valid. These claims were allowed prior to the issue of Tew, in consequence of which there is no such presumption of validity in their favor as would have existed had Tew been cited. We are in accord with the master, and find the claims invalid.

The only substantial limitation over the claims already discussed that appears in claims 23 and 27 is the recital that as a result of the shaping of the pulley band into tire form there is a transverse contraction. There is dispute as to whether this step was anticipated by the Doughty use or the Tew disclosure, with a difference only of degree, but we need not resolve it for it appears to us that transverse contraction is not only the necessary result of a longitudinal or radial expansion, because of the properties of the materials used, rather than a step in the process, but also because this property of both rubber and fabric had been fully understood in the art generally, and had been availed of for very many years in the fabrication of automobile tires by the core making process. Certainly no inventive concept can be apprehended in the use of a property of bias cut fabric which was as fully appreciated in the tire art as perhaps the elasticity of rubber itself. It was this very capability of contraction in the line of width that made the core winding practices of the early art commercially successful. As was said by this court long before Hopkinson, and in the discussion of patents issued as early as 1904 and 1909: "In tire building, it is primarily the central part of the strip which is thus stretched longitudinally as it is attached to the tread of the core, leaving the side portions or wings projecting and free. Upon the same principle, if these side portions are then stretched laterally, they will shrink longitudinally, and, if this stretching is done in progressive measure as the edges are approached, the longitudinal shrinking will be greatest at the edge." Firestone Tire & Rubber Co. v. Seiberling, supra.

Having analyzed the several steps in the Hopkinson process, considered their novelty or lack of it, and whether any denote invention or bring about an inventive combination, we are not prepared to deny validity to claims 2, 9, and 15, but conceiving them to be limited to the precise advance made in the art, in the light of prior uses and disclosures, and with the limitations therein imposed by the Patent Office and accepted by the inventor, we are constrained to reject the broad construction contended for, and so narrowed, find them not infringed. This relieves us of the necessity of discussing the Dykes anticipation, or ruling upon either the interesting question of law or the difficult question of fact raised by the proofs bearing upon the diligence of Dykes' reduction to practice and pursuit of his application. Claims 16, 18, 23, and 27, for reasons indicated, we hold invalid.

### The Gammeter Patent, No. 1,480,719.

This patent covers a process and apparatus for shaping a pulley band to tire form by fluid pressure. It is concededly subsidiary to the Hopkinson patent in suit, but is asserted to disclose a highly meritorious inventive concept in that it teaches the shaping of a pulley band by the use of differential fluid pressure applied directly to the pulley band by means of a fluid-tight chamber, of which the band itself constitutes one wall, instead of the application of fluid pressure within the band by means of an inflatable tube, as in Hopkinson.

The claims in suit are 1, 2, 17, 18, and 19. The first three are for a process.

Claims 1 and 2 are limited to the application of suction to the outer surface of the band while subjecting the inner surface to atmospheric pressure. Claim 17 covers all shaping by differential fluid pressure, whether atmospheric or super-atmospheric. Claims 18 and 19 describe apparatus for practicing the claimed process, and are drawn to cover means for creating differential fluid pressure on the opposite faces of the band, acting directly against such faces. Claim 1, which is sufficiently illustrative of the first group, claim 17, which has no counterpart, and claims 18 and 19, are printed in the margin.[4]

We may say at the outset that we have found the phrase "differential fluid pressure" somewhat confusing, since it is difficult to conceive of shaping in any practical sense by fluid pressure that is not at the same time differential fluid pressure, unless, perhaps, the shaping itself is done in a vacuum. Nor do we apprehend the force of the emphasis placed in argument upon the application of fluid pressure directly to the pulley band, except as it may relate to the breadth asserted for claim 17. Certainly, in applying suction to the exterior of the band, and permitting atmospheric pressure to operate within it, no practical purpose could be served by interposing obstacles to either the suction effect upon the one face or atmospheric pressure upon the other, and so no invention is disclosed in avoiding what no one would conceivably do. It is true that if claim 17 is valid in the scope asserted, and includes all means or methods for extending the band by super-atmospheric pressure from within without the use of an inflatable tube, it extends to a method of applying fluid pressure directly to the inner face of the band, and may in this respect be novel.

We find claim 17, however, invalid. It discloses nothing more than a concept without either means or method suggested in the patent for its materialization. It may be, and probably is true, that where no other difficulties are encountered, fluid pressure shaping, whether by atmospheric or super-atmospheric pressure, comprehends obvious equivalents, and whether a tire band is drawn out by suction or pushed out by compression, substantially the same thing is done. When, however, the inventor conceives of dispensing with the inflatable tube, and shaping by super-atmospheric pressure from within the pulley band, he necessarily conceives sealing the pulley band to make it air-tight, and at once the problem is encountered of placing a retaining member in the sealed chamber to hold the band in tire form for vulcanization. Like many process claims, claims 1, 2, and 17 all disclose mere conception when unaided by the specification, but whereas with respect to claims 1 and 2 the patent discloses means whereby the concept is realized, no such disclosure is found with respect to the broader concept of claim 17, and it will be seen that the means were not obvious.

Claims 1 and 2 are challenged as having been anticipated by Hopkinson patent, No. 1,289,771, and by Sloper patent, No. 1,487,033. This led to the introduction of much evidence upon the disputed date of Gammeter's reduction to practice, whether before or after the issue of the Hopkinson and Sloper patents; his own application having been filed later than either. This issue was resolved below in

[4] 1. The process of manipulating a tire casing which comprises applying suction to the outer surface thereof while subjecting the inner surface thereof to atmospheric pressure, and at the same time moving the bead portions of said casing relatively to each other, to change the form of the casing.

17. The process of forming a tire casing from an endless band, which comprises distending the middle portions of the band by creating differential fluid pressures on the opposite faces thereof and moving the edge portions of the band toward each other, the fluid acting directly against the faces of the band.

18. In an apparatus for forming a tire casing from an endless band, means for supporting the band by its edge portions and moving these portions relatively axially of the band and means for creating differential fluid pressures on the opposite faces of the band, to distend the middle portion thereof, the fluid acting directly against the faces of the band.

19. In an apparatus for forming a tire casing from an endless band having beaded edge portions, means for engaging and making fluid-tight connections with the bead portions of said band to form a fluid-tight chamber whereof one wall is formed by the band, parts of said bead-portion-engaging means being relatively movable to permit the beaded edge portions of the band to approach each other, and means for creating a fluid pressure condition within said chamber different from atmospheric pressure.

favor of the plaintiff, and is here presented. Our conclusion upon the question of infringement relieves us of the necessity of deciding it. In the apparatus claims the means disclosed by the patent for shaping by fluid pressure are means only for applying suction to the outer face of the casing. In R. M. Hollingshead Co. v. Bassick Mfg. Co., supra, wherein the interpretation of the word "means" was in controversy, we recently re-announced our adherence to the rule that "the scope of a patent upon a combination should be limited to the specific devices described or their mechanical equivalents," a rule illuminated by but not in conflict with the discussion in Davis Sewing Machine Co. v. New Departure Mfg. Co., 217 F. 775, 782 (C. C. A. 6). See, also, United Shoe Machinery Corporation v. H. Gordon Co., 59 F.(2d) 903, 904 (C. C. A. 6). The principle discussed in the cited cases was in respect to the use of the word "means" or "mechanism" in an apparatus claim. It seems to us inevitably to follow that in the case of process claims which until aided by description and specification evidence mere concept, and where the means or mechanism by which the process may be practiced are neither obvious nor within mechanical skill, the same principle applies, especially where the means or mechanism relate to the very point of novelty claimed for the process. See American Lava Co. v. Steward, 155 F. 731, at page 738 (C. C. A. 6).

█ Both the process and the apparatus claims of Gammeter embrace the shaping of the tire band by suction applied to its outer surface while at the same time moving the bead portions of the casing relatively to each other to change the form of the casing. We think there can be no inventive concept discovered in the mere thought of shaping tires by vacuum. Indeed, the very patent itself comprehends vacuum and pressure shaping as reciprocal processes, and in the general art of manufacturing shaped articles out of rubber, it was old to apply suction to secure the desired form, reaching even to the tire art itself in the shaping of inner tubes for automobile tires. This is not to say, however, that there may not be invention in the combination of elements which Gammeter disclosed for vacuum shaping. When, however, these elements are considered in the light of the specification, and of the advancement of the art, it is impossible to find infringement either by the defend-

ant's so-called Stevens box or its later Nichols expander. The former uses vacuum for shaping, but is a machine built on a principle differing from that of Gammeter, and employs no means other than suction to move the bead edges toward each other in the shaping process, while the latter is not a suction apparatus at all, but employs super-atmospheric pressure from within and so can be considered as infringing no valid claim. Agreeing with the master, though not in accord with the court, we find claim 17 invalid, and claims 1, 2, 18, and 19 not infringed.

### The Abbott Patent, No. 1,507,563.

[16, █ Abbott, like his predecessor Gammeter, also disclosed an apparatus and method for the shaping of a pulley band by vacuum applied to its outer face and the utilization of atmospheric pressure within the band. He discovered, however, that this could be done without maintaining sealing contact with the beaded edges of the band as in Gammeter, and that the band could be shaped without the necessity of providing moving parts during the operation. This was no doubt a forward step in the art. The Abbott expander is a circular vacuum box of U-shaped construction in cross section, the pulley band being placed therein so that it protrudes both at the top and bottom, with provision made for obtaining sealing contact between the inner edges of its top and bottom walls and intermediate portions of the band. While shaping by suction was not new, we think it was not obvious that it could be applied to tire casings without making sealing contact with the beaded edges of the tire band, and that to provide sealing contact with the irregular surface of such band intermediate its beaded edges so that without moving parts the edges could be brought together and the shaping achieved discloses an inventive concept. In any event, we are not prepared to say in face of the presumption of validity that attaches to the grant, and the weight that is to be given to the concurrent findings of master and district judge, there was no invention in Abbott. Our conclusion is that the apparatus claims are valid, and in arriving at it we do not ignore the contention that they were anticipated by Sloper, No. 1,487,034, a patent not in issue. It is true that a machine built after the Sloper patent, and demonstrated before the master at the Firestone plant in Akron, was so organized that it could be used to form a tire casing in the

same manner in which the Abbott machine was intended to be used. This, however, involved the permanent locking of the lower movable platen in Sloper in a certain position in a manner and for a purpose not taught by Sloper. We think decision calls for the application of the rule that a prior device does not anticipate even though by modification it may be made to accomplish a function performed by the patent, if not designed for that purpose by its maker or adapted for use therefor, Topliff v. Topliff, 145 U. S. 156, 161, 12 S. Ct. 825, 36 L. Ed. 658, rather than for the rule that the patentee may claim for his invention all uses to which the machine may be put, whether understood by him at the time or not. C. & A. Potts & Co. v. Creager, 155 U. S. 597, 606, 15 S. Ct. 194, 39 L. Ed. 275.

The apparatus claims of Abbott being valid, it seems to us clear that they are infringed by the defendant's Stevens box. The Stevens device utilizes the principle of vacuum shaping, and provides for sealing connection with the outer circumference of the pulley band after the manner taught by Abbott; the only difference being in minor details. Where Abbott provides a hinged upper wall to permit removal of the finished tire, the defendant provides a hinged side wall so that its box may be opened and closed as is a bracelet or handcuff. We think these and other differences immaterial, and the fact that the Stevens box was designed and used only after the defendant had witnessed a demonstration of the plaintiff's vacuum expander, and was abandoned after suit was brought upon Abbott, does not militate against this conclusion. The Abbott apparatus claims are valid and infringed.

We see no purpose at this time of passing upon the validity of the Abbott method claims. It is not seriously [5] suggested that the defendant has been guilty of infringement in respect to them other than by the use of the Stevens box, which is now abandoned, and our disposal of a similar situation in Reo Motor Car Co. v. Gear Grinding Machine Co., 42 F.(2d) 965, 971, seems clearly indicated here, since as to infringement but one royalty, whether upon the established or the reasonable basis, would seem appropriate compensation for breach of the plaintiff's monopoly, no matter upon how many bases that monopoly rests. See, also, Gear Grinding Machine Co. v. Studebaker Corporation, 4 F.(2d) 510, 511 (C. C. A. 6). Accordingly we do not pass upon the validity of the Abbott process claims, and as to them the bill will be dismissed without prejudice.

The Sloper Patents, Nos. 1,372,567 and 1,487,033.

The first of the Sloper patents covers a method and the second an apparatus for shaping tires by the use of super-atmospheric pressure applied within the tire band. Sloper appears to have attacked the problem of devising an operable mechanism by which an expansible member might be placed within the sealed tire band for the purpose of retaining it in substantially tire shape after its expansion by super-atmospheric pressure. This, it will be noted, is the problem inherent in shaping by super-atmospheric pressure which Gammeter either did not sense, or for which he disclosed no solution, when he claimed for his patent a scope that would include all fluid pressure, atmospheric or super-atmospheric. The validity of the Sloper patents is not seriously challenged, and although the master was apparently of the opinion that the process claims were functional, we think the only question here is the issue of infringement, and to this we confine ourselves.

Sloper in his apparatus and method converted the tire band into an air-tight chamber by means of movable platens fitted to form sealing contact with its edges. Within this chamber he placed an expansible ring, the specific form described being a jointed metal device having springs which when released would tend to expand it. The Nichols machine operates upon a different principle and differs in structure. The base of the machine is formed with a deep well in which moves a reciprocating plunger to control and position the retaining means which is an inflatable tube with valve connections by which it is evacuated and inflated during the operation of the machine, in timed relation to the action of its other parts.

It is contended that the inflatable bag of the Nichols device is the mechanical equivalent of Sloper's coiled metallic ring.

---

[5] We note a contention below that the Nichols expander infringes method claim 7, but the contention seems to have been abandoned here. In any event that claim cannot be construed to read upon Nichols, and there is no need of deciding its validity.

But Sloper in his patent repeatedly disclaimed the use of an inflated tube for retaining the casing in tire shape, because "these tubes, as is well known, do not last long when so used and so are expensive." It is now urged that Sloper had in mind the comparatively thin tubes of the prior art, which are easily destroyed in use, as distinguished from the thick, heavy air bags now commonly used, and which are so stout that of themselves, without inflation, they are strong enough to hold a shaped pulley band for a time in substantially tire form. The argument is tenuous. The patent law requires a full disclosure of the invention, and permits of no mental reservations either as to the things claimed or the things disclaimed. We have no doubt that as contended, improvement in air bag construction was gradual, and we are impressed by the argument that an inventor may not because of later improvements in an element which he specifically excluded from his combination subsequently recapture it, and that what was said in Columbia Motor Car Co. v. C. A. Duerr & Co. (Selden Patent Case), 184 F. 893, 916 (C. C. A. 2), is applicable to the present situation: "He [the inventor] made the wrong choice, and we cannot, by placing any forced construction upon the patent or by straining the doctrine of equivalents, make another choice for him."

But it is argued that since Sloper disclaimed pneumatic means only in certain claims and not in others, resort must be had to the rule that limitations will not be read into one claim which expressly characterize another. Cadillac Motor Car Co. v. Austin, 225 F. 983, 985, 986 (C. C. A. 6), and authorities there cited. Granted the soundness of this rule of construction, it seems to us a sufficient answer to say that it must yield to the cardinal rule of all construction that the intention of the parties when clearly manifest from the contract must have effect. O. H. Jewell Filter Co. v. Jackson, 140 F. 340, 346 (C. C. A. 8). We are not, however, convinced that the pneumatic tube is not specifically excluded in all the claims when read in the light of the specification. The claims speak variously of the retaining means as "mechanical, non-pneumatic, expansible retaining means," "automatically expansible retaining means," and "a contracted expansible member * * * which expansible member is normally urged by a force tending to expand it." It would seem to us that a re-

taining means which is automatically expansible might well read upon the coiled and spring actuated metal ring of the patent without reading upon an inflatable tube. The former contains within it, though held in leash, the force tending to expand it, while the latter must be expanded by a force from without the air chamber and is therefore not, in the sense of the claims, automatically expansible. Nor is an inert air tube normally urged by a force tending to expand it, as is the coiled spring actuated ring of the patent. It will be noted in our discussion of the Hopkinson reissue patent that neither by Hopkinson nor in the Patent Office were the two regarded as equivalents. In any event we do not consider the air tube as the mechanical equivalent of Sloper's segmental metallic ring, and we are in accord with both master and court in holding neither the apparatus nor process claims of Sloper infringed.

The Hopkinson Reissue Patent, No. 17,618.

The original Hopkinson patent in suit, issued May 21, 1929. The reissue was on March 4, 1930, upon an application filed August 30, 1929. All of the claims in suit were added by reissue, and are drawn to an improvement upon the Sloper apparatus patent in suit. While, as has been seen, Sloper maintained his casing in shape for volucanization by an expansible metal segmental ring, positioned to expand automatically within the shaped tire, the Hopkinson reissue patent describes a buckled inflatable bag which, when raised in operation to a position within the shaped casing and released, expands and functions as a retaining means. This patent is said to be infringed by the defendant's Nichols expander.

We are confronted at the outset with the contention that the reissue claims are invalid because there is no disclosure as to the nature of the inadvertence, accident, or mistake upon which the reissue application was based. All that the applicant says upon that subject is that "a failure to present claims of the scope indicated arose inadvertently through an oversight of the inventor." While the statute is not specific as to that which constitutes inadvertence, accident, or mistake, and the courts have read into it a right to reissue where justified by equitable principles, Keller v. Adams-Campbell Co., 264 U. S. 314, 317, 44 S. Ct. 356, 68 L. Ed. 705, it seems to us clear from the authorities that while great liberality must be accorded the inventor

who has failed in his original application to claim his true invention, and that upon substantial showing that he has failed to do so through some error innocently made, the decision of the Commissioner as to his right to a reissue will not be reviewed, yet, where no basis for a conclusion that there was such error is either asserted or proved, or where the evidence is conclusive that there was none, the reissue is void. Peoria Target Co. v. Cleveland Target Co., 58 F. 227, 239 (C. C. A. 6). In our most recent decisions on this subject, the rule has been fully considered and the authorities carefully reviewed. H. W. Roos Co. v. McMillan, 64 F.(2d) 568; Union Switch & Signal Co. v. Louisville Frog, Switch & Signal Co., 73 F.(2d) 550, 552. In the latter case we took pains to point out that the oath there considered failed to comply with Rule 87 (d) of Patent Office Practice, requiring that it should particularly specify "the errors which it is claimed constituted the inadvertence, accident, or mistake relied upon and how they arose or occurred." The oath to the Hopkinson reissue application is no more specific than that there involved.

But even were we to consider the reissue application and verification sufficient, it yet appears from the file wrapper history of the case that there was in fact no inadvertence, accident or mistake. Hopkinson in his original patent presented a claim (5) which contained as one of its elements "means for aligning a flexible and resilient member and causing the same to be moved into positive engagement within the shaped pulley band to maintain its imparted shape." This claim, among others, was rejected on Sloper. Hopkinson then amended his claim by adding to "means for aligning a flexible and resilient member within said band" the following: "and means coacting with said member to cause the same to be moved, etc." He pointed out to the Patent Office that neither in Sloper nor in Abbott is there such coacting means since in each of them the movement of the retaining member is caused by the characteristics of the member and not by any means acting thereon, the characteristics being the spring construction of the Sloper device and the inflation of the air bag in the Abbott construction, and that while he has an inflatable air bag as does Abbott, he has in addition the means for forcing the bag outwardly. The reissue claims contain no such limitation as do the amended claims accepted, and the patentee cannot thereby recapture what by limitation he earlier abandoned. We think these circumstances point clearly to the absence of inadvertence, accident, or mistake.

We note the contention that in considering file wrapper history upon the question of estoppel, no attention need be given to the arguments of the solicitor, based upon the case of A. G. Spalding & Bros. v. John Wanamaker, 256 F. 530, 533 (C. C. A. 2), and our own comment in Byers Machine Co. v. Keystone Driller Co., 44 F.(2d) 283, 285. We are not at present, however, concerned with the question of estoppel, but are considering whether there was any evidence of inadvertence, accident or mistake to support the Commissioner's grant of the reissue, and upon this question we understand contemporary records to be pertinent. H. W. Roos Co. v. McMillan, supra. It must also be noted that in his original application Hopkinson was his own solicitor, so that no misunderstanding between inventor and counsel as to the true nature and breadth of the invention may now be urged. The reissue claims in suit are invalid and it becomes unnecessary to consider the questions of infringement or intervening rights.

The Lough Patent, No. 1,607,266.

This is for a breaker strip, which in conventional tire casing manufacture is interposed between the tread rubber and other carcass elements. Its function is to prevent localization of road shocks by distributing the stresses throughout the tire. The single claim in suit (3) is easily understood, and we think quite clearly presents not only the problem before us but its inevitable answer. It reads: "A breaker strip consisting of rubberized interwoven cord elements forming a diamond-shaped mesh the diagonals of which mesh are shorter lengthwise than crosswise the strip whereby to increase the capacity of the strip to be distended without rupture."

Experience had taught tire makers that upon expansion some of the threads of the breaker strip would part, expansion being greatest at the tread. Breaker strips had been cut both from woven fabric and from cord fabric. The rearrangement of the cords upon expansion of both types of fabric had long been fully understood. Lough, an employee of the plaintiff, claimed to have conceived the idea that greater expansibility could be obtained by a process of "racking," an elongation of fabric be-

fore rubberizing preliminarily made in a direction opposite to that in which the fabric is later to be stretched. In our opinion this did not amount to invention, and we hold the claim invalid.

Lough did not invent breaker strips; he did not invent fabric; he invented no process for rubberizing it. He used an old material in an old way in an old art, and obtained only an improvement in degree by a treatment within the reach of those skilled in the art. But even were we to grant some measure of inventive thought to this minor advance, it was clearly anticipated in related uses of woven fabric as early as the Solis patent, No. 5,908 (1848), reissue No. 636 (1858). Moreover, Lough's manipulation of the fabric would appear to be a step in a process rather than an element in a product. No new article was created when the squares in woven fabric were changed to diamonds running lengthwise in one direction instead of another, or when the cords were realigned by preliminary stretch. On the relationship of method concept to machine or article concept, see Nestle-Le Mur Co. v. Eugene, Ltd., 55 F. (2d) 854, 856, 857 (C. C. A. 6). In our conclusion of invalidity we again find ourselves in accord with the master rather than with the court.

The decree below will be set aside. A decree may be entered granting the plaintiff the usual relief for infringement of the apparatus claims of Abbott patent, No. 1,507,563, and dismissing the bill as to the other patents in suit, including dismissal without prejudice as to the Abbott process claims. The defendant having prevailed substantially in its appeal, and wholly in the cross-appeal, will be allowed its costs.

### On Petition for Rehearing.

The petition for rehearing calls attention to the fact that while our original opinion concedes validity to the Sloper patent, No. 1487033, and rejects the contention that it is infringed by the pneumatic retaining means of defendant's Nichols expander, no specific holding is incorporated therein with respect to claims 1-4 of Sloper, which include no element operating as a retaining means, but disclose subcombinations, complete in themselves. Such subcombinations, it is asserted, may be the subjects of valid claims under the rule of White v. Dunbar, 119 U. S. 47, 51, 7 S. Ct. 72, 30 L. Ed. 303, and without regard to whether the claims in themselves disclose an operable device.

Deering v. Winona Harvester Works, 155 U. S. 286, 302, 15 S. Ct. 118, 39 L. Ed. 153.

Our failure to deal fully with Sloper is perhaps due to the emphasis in brief and argument upon the question of infringement, and the insistence of the petitioner upon the equivalency of the Nichols pneumatic tube to the Sloper mechanical ring, notwithstanding Sloper's express disclaimer of the former. Additional comment on Sloper is therefore indicated.

Whether the Sloper claims 1-4 are to be limited to the particular retaining means disclosed in the drawings and described in the specifications, or whether they are to be so broadly construed as to include any and all retaining means, we are not required to decide. Certainly in the state of the art, no teaching of commercially practical value is contributed to the industry, by claims which describe but a shaping means, while silent as to means or mechanism by which tire shape may, economically and with required precision, be retained until "set" by vulcanization. Accepting the broader construction, we fail to sense invention in claims 1-4 of Sloper and are in accord with both master and court below, in denying them validity, on the ground that they show no more than routine mechanical advance over Gammeter patent in suit.

Gammeter shaped by vacuum, with the aid of movable platens in sealing contact with the upper and lower edges of the pulley band. Sloper's subcombination claims disclose shaping by super-atmospheric pressure with the aid of platens, in similar contact with the band. We pointed out in our discussion of Gammeter that vacuum and pressure shaping are but reciprocal processes and that the petitioner's argument for validity of claim 17 in Gammeter was necessarily based on their equivalency. We conceded validity to Gammeter's combination of movable platens in sealed contact with the edges of the band, and the air-tight vacuum box enveloping it. Given Gammeter, however, the sealing of the pulley band, the movable platens to force its bead edges toward each other, and their sealing contact with the bead edges are all at hand for the skilled mechanic. The only extemporizing required was to provide platens of size to seal the openings in the pulley band instead of those in the vacuum box, and to reverse air control so as to achieve compression rather than vacuum. Neither step rose to invention.

Gammeter failed, we thought, to sense or, sensing it, to solve the problem of placing an operable retaining device in a sealed chamber, if his claim 17 was as broad as contended. This we thought was not obvious, and this we conceived to be the problem to which Sloper chiefly addressed himself. In no other respect does our original opinion indicate solution by Sloper of that which was beyond Gammeter.

Claims 1–4 of Sloper we hold to be invalid, but no change is thereby required in our direction to the District Court.

The petition for rehearing is therefore denied.