## MIDLAND STEEL PRODUCTS CO. v. CLARK EQUIPMENT CO.

### No. 10781.

United States Court of Appeals
Sixth Circuit.

May 31, 1949.

F. O. Richey, Cleveland, Ohio (H. F. McNenny, Cleveland, Ohio, on the brief; Richey & Watts, Cleveland, Ohio, and Smith, Strawhecker & Wetmore, Grand Rapids, Mich., of counsel), for appellant.

John A. Dienner and Edward C. Grelle, Chicago, Ill. (Brown, Jackson, Boettcher & Dienner, Chicago, Ill., Walter E. Schirmer, Buchanan, Mich., and Frank E. Liverance, Jr., Grand Rapids, Mich., of counsel), for appellee.

Before HICKS, Chief Judge, and SIMONS and ALLEN, Circuit Judges.

SIMONS, Circuit Judge.

The appellant sought remedies for alleged infringement of four patents and appeals from a decree denying it relief. The patents lie in the welding art, were all granted to Riemenschneider and assigned to the appellant. The first is No. 1,810,-

112 for a process for welding metal tubing, granted June 16, 1931 upon an application filed August 6, 1930. This patent discloses the inventor's basic concept, and the succeeding patents reveal improvements in the process and apparatus for carrying it out. They were granted on co-pending applications and are No. 1,948,801 granted February 27, 1934; No. 2,061,671 granted November 24, 1936, and No. 2,139,771 granted December 13, 1938. A number of the claims of each of the patents in suit are asserted to be infringed by the assembly and use of a certain welding machine installed by the appellee in 1941, for which the General Electric Company supplied the welding head.

The branch of the art to which the inventor applied himself was that of welding tubing by arc welding without the use of welding rods. Concededly, he was not a pioneer in this branch of the art and his inventions concern themselves with improvements for increasing the speed of welding, producing better welds in the case of large diameter tubing, and eliminating much of the manual handling of material required by conventional processes. The steps of his method as first described in his 112 patent, include passing the strip stock through forming dies or rolls by which it is formed into a tubing of desired cross-section, with the edges of the strip brought close together defining an open longitudinal seam. The tube then passes under a plurality of electric arcs arranged for progressive heating. During the passage of the tube past the electrodes the inner surfaces are supported by a welding shoe, and the metal along the seam is melted to a liquid state so that it forms a molten stream or narrow pool confined along the sides by the strip and beneath by the shoe. While the metal is in this molten state the edges of the tube are brought nearer to each other by passing the tube between pressure-producing rolls or other suitable means, and when sufficiently cooled the tube passes between seam reducing rollers which bring the tube to desired cross-section and forms a seamless tubing.

The method thus sketchily described creates what is known as a fusion weld, and this concept is carried through all of the patents, the idea being in the 801 patent that the projection of a stream of low-velocity hydrogen gas into the open seam cleft to the full depth of the spaced-apart edges, creates molten metal on the edges to their full depth, thereby bridging the cleft. The 671 patent includes a specific organization of electrodes in a welding head, and the 771 patent provides for a mandrel within the tubing for supporting the molten metal within the seam cleft, and means for cooling the under surface of the molten metal in the cleft.

The issues require for their understanding a somewhat detailed narrative, going back to the beginning of the controversy. About 1936 General Electric developed and sold to the appellee a welding head for use in connection with atomic-hydrogen welding of thick-walled metal tubing. This head was embodied in a welding machine which was placed in operation by the appellee in 1938. The appellant claimed that this welding head and the method and other apparatus employed by the appellant in its use, infringed the patents in suit. General Electric also asserted infringement by the appellant of certain of its patents. In settlement of this controversy an agreement was reached by which the appellant granted General Electric a fully-paid, non-exclusive license to make, use and sell apparatus for welding embodying the inventions claimed in the 671 patent, with the exception of that embodied in claim No. 10, for the full term of the patent and any reissue or extension, and the appellant also released and discharged all prior purchasers of welding apparatus from General Electric which embodied the inventions of that patent. The agreement further provided for a non-exclusive, royalty-free license to the appellee to use the one apparatus for atomic hydrogen welding theretofore purchased from the General Electric Company, and released and discharged the appellee from any and all claims for infringement of the four patents in suit arising prior to the date of the agreement. It also provided that upon its execution General Electric would pay the appellant $10,000, which was done. The

pertinent provisions of the agreement are set forth in the margin.[1]

No claim for royalties or damages and no prayer for injunction with respect to the first welding machine of the appellee, is involved in the present controversy. It relates entirely to the second machine installed by the appellee in 1941 and thereafter operated. It is conceded that the second or accused machine is, with some immaterial modifications, identical with the first or licensed machine. The questions therefore arise as to whether the appellee is estopped to deny the validity of the patents, whether it is estopped to deny infringement, and whether, if not so estopped, the accused machine does, in fact, infringe.

■ The holding was that the appellee was estopped to deny the validity of the patents in suit. This was on the ground that because it held an unexpired license for the use of its first machine, and its accused machine was identical, and because it had been granted by paragraph 7 of the agreement, the right to obtain a license for additional machines on a specified royalty basis, there was thereby created an implied covenant binding the defendant not to make or use atomic hydrogen welding machines other than its first machine, without obtaining from the appellant a license on the royalty basis prescribed in paragraph 7. By this implied covenant it was estopped to deny the validity of any of the patents in suit. The appellee denies the existence of such covenant either under paragraph 7 standing by itself, or when construed with paragraph 5. It says that an unaccepted offer does not create a covenant. There is no estoppel, it insists, without an express agreement not to contest the patent, and estoppels are not favored in that they prevent the presentation of the true facts. Finally it urges that the accused machine is, by the express language of the agreement, without the scope of the license, so that no estoppel arises. In view of the conclusions at which we have arrived, presently to be presented, we have no need to decide whether appellee is estopped to deny validity, although many cases both pro and con are urged upon us bearing upon the problem. The court also concluded that even though the appellee is denied, under the circumstances of this case, the right to challenge validity, this does not bar it from questioning the scope of the patents in connection with its defense of noninfringement, and with this conclusion we agree. Westinghouse Electric & Manufacturing Co. v. Formica Insulation Co., 266 U.S. 342, 45 S.Ct. 117, 69 L.Ed. 316; Noonan v. Chester Park Athletic Club Co., 6 Cir., 99 F. 90, 91. While both of these cases deal with estoppels operating upon assignors of a patent, the limitations upon the scope of the estoppel appear to be the same in cases where it operates against a licensee, Limbershaft

---

[1] "5. Midland (Steel Products Company, plaintiff) does hereby grant to said Clark Equipment Company (defendant), a non-exclusive, royalty-free license under said Letters Patent Nos. 1,810,112; 1,948,801; 2,061,671 and 2,139,771 to use the one apparatus (first machine) for atomic hydrogen welding heretofore purchased from General to the full end of the terms of said Letters Patent, or any reissue or reissues, or extension or extensions thereof. * * * Midland releases and discharges said Clark Equipment Company from any and all claims for infringement of said Letters Patent Nos. 1,810,112; 1,948,801; 2,061,671 and 2,139,771 arising prior to the date hereof.

"6. General hereby grants to Midland a non-exclusive, fully paid, royalty-free license under the said Letters Patent Nos. 1,916,014; 1,946,302; 1,946,305; 1,947,267, and all other General patents or applications existing at the date of this agreement and relating to atomic hydrogen welding, * * * to the full end of the terms of said Letters Patent. * * * General hereby releases and discharges Midland from any and all claims for infringement of the aforesaid Letters Patent arising prior to the date hereof.

"7. To those purchasers of apparatus for atomic hydrogen welding manufactured and sold by General, upon request of such purchasers, Midland agrees to grant non-exclusive, non-assignable licenses under claim 10 of said Letters Patent No. 2,061,671 and under said Letters Patent Nos. 1,810,112; 1,948,801; and 2,139,771 and any reissue or reissues, or extension or extensions thereof, on a royalty basis not greater than the following, based on the cost of stock used in manufacturing under said Letters Patent:"

Sales Corp. v. A. G. Spalding & Bros., 2 Cir., 111 F.2d 675, 677; Standard Plunger Elevator Co. v. Stokes, 2 Cir., 212 F. 941, 943. As Judge, afterwards Mr. Justice Lurton, observed in the Noonan case, supra, "But this estoppel, for manifest reasons, does not prevent him from denying infringement. To determine such an issue, it is admissible to show the state of the art involved, * * *." [99 F.2d 91.] We are in accord.

The appellee denies infringement and says that its accused machine was constructed and operated in accordance with disclosures and claims of Catlett patents Nos. 2,282,031 and 2,282,032, granted May 5, 1942. These patents are, of course, later than the patents in suit, but it must be inferred, for the purpose of this case, that they distinguish from prior art including the patents in suit, by the presumption of validity that inheres in the grants. The Catlett patents disclose apparatus and method for the welding of thick-walled metal tube stock by beveling the edges of the stock so as to form a V-shaped groove in the upper portion of the seam and by bringing the lower edges of the stock into contact, thereby forming a Y-shaped seam cleft. The projection of heat into the V-shaped groove creates a pool of molten metal in the groove and raises the abutting edges or stem of the Y-shaped seam into a forged welding temperature. The essential difference, therefore, between the Riemenschneider and the Catlett process is that in the one case the split edges of the tube are spaced apart and the stream of hydrogen gas is projected to the full depth of the seam, creating a pool of molten metal to the full depth of the edges and resulting, under compression, in a fusion weld, while in the other the lower portion of the edges of the seam are brought into contact and heated only to the temperature required to achieve, by compression, a forged weld. It is true that by the latter method a fusion results in the upper part of the seam by reason of the melting of metal through temperatures required to bring the lower portion of the seam to a forging temperature, and it is upon the basis of this result that identity of method is claimed and the charge of infringement supported.

Were there no prior art and no history in the patent office in respect to the patents in suit, it would seem to be a simple matter to conclude that the charge of infringement had been sustained by the application of the principle that a difference in degree does not avoid infringement, by resort to the doctrine of equivalency and to those inferences that sometimes are said to flow from the acceptance of a license for a patented device. But the teachings of the art, the experience of the inventor with his applications and the circumstances under which the license was granted, present a different aspect. Riemenschneider was not a pioneer in arc welding methods and came into a crowded art. This he frankly concedes in his 112 patent. He was not the first to use the atomic hydrogren flame by blowing gas through an electric arc for welding. General Electric was experimenting with this as early as 1924, and its discoveries were published in 1926 and '27 and were at once applied to automatic tube welding. The appellant had itself ordered atomic hydrogen heads with automatic controls from General Electric. The licensed machine of the appellee was developed by Catlett and involved problems not considered by Riemenschneider because of the unusual thickness of the stock required in manufacturing processes of the appellee. The machine finally produced by Catlett operated, in the main, on the principle of solid phase welding which Catlett later described in patents. The minimum fusion at the top of the weld could have been avoided except for economic reasons, though Catlett's process produced a forged weld for about 60% of the depth of the seam.

The concept of Riemenschneider as derived from a study of his patents and their patent office history, going back to his abandoned application of 1930, was that his invention involved spaced-apart edges of the tube and a melting flame projected to the full depth of the seam. It was only by incorporating this step in his process that he was able to distinguish

his invention from prior art so as to be granted patents thereon. No inference as to identity of process and apparatus can be drawn from the license granted to the appellee for its first machine. Elsewhere we have expressed the view that it is no tribute to a patent when competitors exchange licenses. Firestone Tire & Rubber Co. v. United States Rubber Co., 6 Cir., 79 F.2d 948, 954. When in 1938 the accused machine was put in operation and viewed by the appellant, it was thought by the latter to be an infringement, and a controversy arose between it and General Electric. That company, occupying a position between two good customers, effected a compromise, but the appellee was unaware of the negotiations or the license taken in its behalf until notified of it in February, 1939. It paid nothing for the license and did not signify its acceptance until it filed its answer in the present suit.

In view of these circumstances we are of the view that the patents in suit are of narrow scope, that they must be confined to fusion welding for the full depths of the seam, created by spaced-apart edges, and do not extend beyond that limited area. We are constrained so to view it, by the identity of the problem here encountered, to that which was considered in Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 220, 61 S.Ct. 235, 239, 85 L.Ed. 132, where the court observed, "It is a rule of patent construction consistently observed that a claim in a patent as allowed must be read and interpreted with reference to claims that have been cancelled or rejected and the claims allowed cannot by construction be read to cover what was thus eliminated from the patent." A somewhat broader principle also applicable here has never, so far as we know, been stated with more clarity and precision than by the late Judge Denison speaking for this court in D'Arcy Spring Co. v. Marshall Ventilated Mattress Co., 6 Cir., 259 F. 236, 240, 241, " * * * where the claim defines an element in terms of its form, material, location or function, thereby apparently creating an express limitation, where that limitation pertains to the inventive step rather than to its mere environment, and where it im-

ports a substantial function which the patentee considered of importance to his invention, the court cannot be permitted to say that other forms, which the inventor thus declared not equivalent to what he claimed as his invention, are nevertheless to be treated as equivalent, even though the court may conclude that his actual invention was of a scope which would have permitted the broader equivalency." This principle we have applied in many cases, including Hollingshead v. Bassick Mfg. Co., 6 Cir., 73 F.2d 543, 548; Firestone Tire & Rubber Co. v. United States Rubber Co., supra, 79 F.2d at page 955; United Shoe Machinery Co. v. O'Donnell Rubber Products Co., 6 Cir., 84 F. 383, 386; Shearer v. Atlas Radio Co., 6 Cir., 94 F.2d 304, 306; A. O. Smith Corporation v. Lincoln Electric Co., 6 Cir., 82 F.2d 226, 229.

The appellant tried to show that the weld produced upon the accused machine was, in reality, a fusion weld through its entire depth. This was based largely upon an inference that light observed in the tube had its source in the seam at the line of hydrogen gas projection, and upon certain expert testimony as to the character of the welded seam. The evidence supporting this effort did not impress the district judge and it does not impress us. Certainly there was no purpose on the part of Catlett, who designed the machine, nor of the appellee in its operation, that a fusion weld should result. General Electric undertook to participate in defense against the patents in suit and to share its expense only upon agreement that its instructions as to the use of the accused machine should be carefully followed. There is no evidence that they were not.

We have no quarrel with the appellee's statement of law that an element cannot be read into a claim in order to make out a case of noninfringement. Certain of the claims, it urges, say nothing about the full depth of the seam or the reduction of the edges to a molten condition for their full depth, and therefore it urges that these elements may not be read into such claims. The inventor's concept of his invention so clearly involves the spaced-apart edges and their molten condition to their full depth that none of the

546

claims may, in the light of the specifications, be interpreted without recognition of that concept, and the steps in the method which are expressed in the claims, are a necessary and inescapable response to it. Without consideration of the inventor's fundamental idea, neither the method nor its separate and interrelated steps would be intelligible.

We have not thought it necessary to analyze each of the claims in suit and specifically to rule in respect to each claim on the question of infringement. This has sufficiently been done by the district court in its carefully developed opinion, 75 F. Supp. 143. It is only necessary to say that the findings of fact there announced are based upon evidence, that we do not perceive clear error either in the facts found or in the inferences drawn therefrom, and we agree in the main, with the reasoning.

The decree as to all four patents is affirmed.