INDUSTRIAL MACHINE TOOL COM-
PANY, Inc., Appellant and
Appellee,

v.

MIAMI WINDOW CORPORATION,
Appellee and Appellant,

MIAMI WINDOW CORPORATION,
Appellee and Appellant,

v.

INDUSTRIAL MACHINE TOOL COM-
PANY, Inc., Appellant and
Appellee,

Thomas G. Belmont and Sidney S.
Stearns, Intervenors-Appellees.

No. 15788.

United States Court of Appeals
Fifth Circuit.

June 8, 1956.

W. G. Ward, Miami, Fla., Ward & Ward, Miami, Fla., for appellant-cross-appellee, Industrial Mach. Tool Co., Inc.

N. J. Durant, Joe Creel, Miami, Fla., for appellees.

Before TUTTLE, CAMERON and JONES, Circuit Judges.

CAMERON, Circuit Judge.

The appellant, Industrial Machine Tool Company, Incorporated, appeals from a judgment by the District Court dismissing its complaint against the appellee, Miami Window Corporation.[1] The only question for our determination is whether the findings and conclusions upon which that judgment was made are clearly erroneous within the meaning of Rule 52 (a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.

The original claim by Industrial alleged a breach by Miami Window of the distribution and sales territorial provisions of its license to manufacture and sell windows under the Belmont-Stearns

---

1. Miami Window filed a counterclaim for damages against Industrial, but its attorney stated in the course of the proceedings that Miami was not interested in prosecuting the counterclaim and that no testimony would be offered with re- spect to it. The trial Court announced in its findings that Miami had failed to establish its allegations and that it should be dismissed. It will not be considered further in this opinion.

patents. Industrial alleged that it was and had been producing awning-type windows under a license agreement of April 22, 1949, as supplemented by an agreement dated January 11, 1950, from the patent licensor, Belmont,[2] this being the same window as that produced and sold by Miami Window.[3] The suit grew out of the fact that Belmont, being the owner of the exclusive right to manufacture and sell aluminum or magnesium windows under patent 2,383,912, referred to in the record and here as the "912" patent, and the owner of patent 2,478,-044, referred to as the "044" patent, first sold to Porterfield certain rights to manufacture and sell said windows, which rights were transferred to Miami Window; and subsequently sold to Industrial the right to manufacture and to sell windows under these patents.

In its answers, Miami Window set up that its sales outside Florida, the only state specifically mentioned in its license agreement from Belmont and in the other states which were claimed as the exclusive territory of Industrial, were upon consent of Belmont and with knowledge and consent of Industrial. It was also asserted that all sales by Miami Window in the "exclusive" territory of Industrial were of a weatherstripped window which Industrial could not supply until July, 1953; that Industrial had sold all the windows it could manufacture under its aluminum allotment and, therefore, Industrial had in no respect been injured. Furthermore, Miami alleged that, since September, 1953, it had not manufactured windows under the Belmont-Stearns patents, but had produced and sold only its "Series 54" and "Series

2. Wherever the name Belmont is used in this opinion, unless otherwise indicated, the reference will be to Joseph G. Belmont, the father, to whom M. B. Morris, patentor of the patents involved, had granted exclusive right to manufacture and sell windows of aluminum or magnesium or their alloys by instruments dated August 29, 1946 and July 27, 1946, pertinent portions of which are set forth in footnote 5 infra. Morris had sold the original patent to Sidney S. Stearns. Joseph G. Belmont died before this litigation was concluded and his administratrix, Elvira Belmont, intervened.

In the meantime, before his death, Joseph G. Belmont had assigned all of his rights in his license agreements on August 22, 1952 to his son, Thomas G. Belmont, whose only activity of note in connection with the facts involved in this litigation was that he gave the cancellation notice to Miami Window dated August, 1954.

At the suggestion of the Court below and by agreement of the parties, Thomas G. Belmont filed an intervention in very general terms, making no claim for relief except that the Court "protect and enforce the rights of all parties including petitioner." Later Thomas Belmont amended his intervention and filed a cross-claim against Miami Window for royalties claimed to be due and for an injunction against further sale in what was claimed to be the restricted territory.

The intervention filed by Elvira Bel-

mont and Thomas G. Belmont also asked, by way of "counter-claim" certain relief against Sidney S. Stearns.

Sidney S. Stearns filed a "counterclaim" dated May 20, 1954 claiming relief against Thomas G. Belmont and Elvira Belmont, Administratrix, asking for accounting for unpaid royalties.

The Court below stated that the controversy raised in the interventions between Belmont and Stearns would be deferred until other issues were determined. Finally, as the trial in the Court below was beginning, the Court had the attorneys representing Stearns and Thomas G. Belmont called to court.

In response to the Court's question the attorneys for both of these parties stated that they aligned themselves with Industrial, agreeing in advance to be bound by what the Court did in the litigation being tried between Industrial and Miami Window. These attorneys did not participate further in the case and the Court entered this finding with respect to the Stearns and Belmont interventions:

"In this case Stearns and Belmont were, at the Court's insistence, made parties, and their counsel announced that the position of the plaintiff was their position. Hence, the conclusion that the decision herein announced is binding upon both Stearns and Belmont."

These parties made no appearance or argument before us, and their connection with the case will not be noticed further in this opinion.

3. See footnote 5, infra.

6400" windows, which embraced none of the claims embodied in the Belmont-Stearns patents and not contained in the prior art, and that it had not, therefore, infringed these patents.[4]

In deciding against Industrial's contentions, the Court sustained Miami's two separate defenses, each related to a different period of time. It held that, as to the period beginning with Industrial's license in April, 1949 and ending with the late summer of 1953, there could be no recovery for these reasons: Miami's license, given and fully utilized for two years before Industrial's, indicated in its terms that the parties contemplated that Miami was to conduct sales in unrestricted territory if Belmont gave his consent; that Belmont, while an officer and stockholder of Miami Window, gave his consent to an ever-increasing volume of sales throughout the United States and many foreign countries, all the while collecting his royalties and being beneficiary of the extensive sales of his corporation.

It held further that Industrial bought its licenses from Belmont with knowledge of and subject to Miami's prior rights (both parties rely on 69 C.J.S., Patents, § 250, p. 774, "The licensor can convey no greater title or interest than he possesses * * *"); that the officers who ran Industrial in collaboration with Belmont, also, ran Miami Window for eighteen months during which time Miami's expanded sales operations were conducted and, in addition, Industrial released to Belmont large segments of its supposedly exclusive territory, thus acquiescing in Miami's right to sell unrestrictedly with Belmont's consent; that Industrial had, moreover, contracted that Belmont could satisfy demands for windows it could not meet, and that aluminum shortage made it impossible for Industrial to meet the demand so satisfied by Miami with Belmont's consent and aid, so that Industrial was not damaged.

As to the period beginning with the summer of 1953, the Court held that Miami had ceased making or selling a window which infringed upon the patents Industrial was licensed to sell so that Industrial had no claim arising from Miami's activities during this second period.

The evidence showed that Miami Window Corporation was incorporated in September, 1947 by C. B. Porterfield, his wife, and Joseph Belmont for the purpose of manufacturing and selling windows under the "912" patent. At this time Belmont held an exclusive right to make and sell aluminum or magnesium windows under that patent. In April, 1947 Belmont and Porterfield had entered into a license agreement whereby Porterfield was given the exclusive right to manufacture the "912" window in the State of Florida and providing that Porterfield would not sell or offer for sale the window outside the State of Florida except as might be consented to by Belmont.[5] Upon the organization of Miami Window Corporation, Porterfield, with the consent of Belmont, assigned to it his rights under the license agreement from Belmont. Belmont was, from the outset, an officer, director and stockholder in Miami Window and continued as such until late 1952.

Production by Miami Window of a window known as "Series 50" or "51" was commenced; and, beginning in about July, 1948 and continuing until the fall of 1953, sales of these windows by Miami

4. Miami Window's amended answer raised the issue of the validity of the Belmont-Stearns patents but the Court below granted Industrial's motion to strike those averments. Since we are affirming the Court's final judgment in appellee's favor on other grounds, it is not necessary to deal with this contention.

5. "(1) Belmont hereby grants to Porterfield the exclusive right, license and privilege to manufacture, or cause to be manufactured solely in the State of Florida, windows made of aluminum and/or magnesium and/or their alloy pursuant to the said copy of contract between Morris and Belmont attached hereto.

"(2) Porterfield will not sell, or offer for sale, any such windows outside the State of Florida, *except as may be consented to by Belmont.*" [Emphasis added.]

Window were made throughout the United States and in several foreign countries. Belmont received royalties upon these sales and, during most of the time, was stockholder and officer in Miami Window.

In April, 1949 Belmont executed a license agreement with Industrial which gave it the exclusive right to *manufacture* windows under the Belmont patent "912" in the United States except in Florida and California; and a supplementary agreement executed January 11, 1950 and between the same parties expressly added the right to *sell* as well as manufacture.[6] In May, 1952, a second supplemental agreement was executed between Belmont and Industrial, wherein Industrial released to Belmont certain states, including Alabama and Mississippi. This agreement contained a provision similar to that in the 1949 agreement concerning Belmont's right to fill orders when Industrial should be unable or unwilling to do so and requiring a notice to Belmont within forty-eight hours after receipt of an order which Industrial was unable or unwilling to fill.

On the same day that the license agreement between Industrial and Belmont was executed, individual officers or stockholders of Industrial purchased stock in Miami Window Corporation in an amount representing two-fifths of the outstanding stock in that corporation. Almar Westman, President of Industrial, became a director and officer of Miami Window Corporation and continued in such capacities until October 12, 1950, when he and the others of Industrial disposed of their entire stock holdings in Miami Window. From October 4, 1949 until October 12, 1950, Almar Westman served as President of Miami Window Corporation and, during this time, sales by that Corporation of a very large number of its "Series 50" and "51" windows produced under the Belmont patent were made by it outside Florida and within the territory claimed as exclusive by Industrial.

In 1950 the Miami Window Corporation of Mississippi was organized, and on October 15th of that year Miami Window, with Belmont's consent, executed a license to the new corporation to manufacture windows under the Belmont patent in Mississippi and Alabama. For a time Industrial and Miami Window carried on a joint advertising campaign. In May, 1952 Industrial, by letter to Belmont, gave Belmont the right to sell in certain eastern states within Industrial's "exclusive" territory until it was able to supply the demands of those states; and other territory was likewise released to him. Belmont withdrew as a stockholder and director of Miami Window Corporation in October, 1952 and, by written notice in August, 1954, Thomas Belmont, his successor, cancelled the license agreement with Miami. Thereafter appellee no longer made any claim to or under the Belmont patents.

6. Pertinent provisions of the License agreement of April 22, 1949 are:

"(a) Belmont does hereby grant unto and license Industrial with the exclusive right to manufacture the above referred to aluminum awning-type windows embodying said patent and any and all improvements thereon in the entire territory comprising the United States of America with the exception of the States of Florida and California."

"(d) With prompt expedition, but not later than four (4) months after the signing of this Agreement, Industrial guarantees to be capable of producing and to produce if required a minimum of 200 windows per day, the cost of preparation and such manufacture to be at the sole expense of Industrial."

The supplemental agreement of January 11, 1950 gave Industrial the right to *sell* as well as *manufacture* and paragraph (h) of the 1949 agreement was amended so as to read:

"(h) In the event of or at the time Industrial should be unable to supply the demand for such windows as evidenced by bona fide orders, said Belmont shall have the right after 30 days' notice to Industrial to engage in the manufacture and/or sale of such windows for the purpose of fulfilling such demand over and above Industrial's capacity and may continue to fulfill such demand over and above Industrial's capacity but only so long as Industrial shall be unable to fulfill said demand. This shall not constitute a default."

The evidence disclosed that, until July 15, 1953, Industrial could not supply weatherstripped windows, whereas Miami Window had been manufacturing and selling such weatherstripped windows continuously since 1950. In addition, between October, 1950 and July, 1953 aluminum was frozen under government control and was being allotted to users on a quota basis. During this time Industrial used all of its quotas of aluminum and could not, therefore, manufacture or sell any additional windows. Beginning in May, 1953, Miami Window began producing its "Series 54" window and soon thereafter it began production of the "Series 6400" window, which was a lightweight version of the "Series 54". Appellee discontinued production of its "Series 51" window in August, 1953, and made substantially no sales of this type window outside the State of Florida after that date.

The Court found that Miami Window had never manufactured outside the State of Florida and that all sales by it of windows outside the State of Florida were made upon consent of Belmont. The consent is at once apparent from the fact that it was while Belmont was an active stockholder, director and officer in the Miami Window Corporation that it had undergone a period of impressive expansion during which sales in large volume were made outside that state in asserted conformity with rights which were granted in the license agreement from Belmont to Porterfield and, by him assigned to Miami Window. These expanded sales were concededly made with the knowledge of Belmont who collected his royalty in every instance. Moreover, incorporation of the Miami Window Corporation of Mississippi and the license agreement by appellee with that corporation were both at a time when Belmont was active as an officer in the appellee corporation and he consented to this license agreement. The Court found that this pattern of consent from Belmont with regard to the sales by Miami Window outside Florida was established and that it continued even after Belmont withdrew

from the appellee corporation and until, through his son, the license to appellee was cancelled.

The Court further found that such pattern of outside sales governed the rights and liabilities of Industrial in its relationship with appellee based upon the facts above set out and here recapitulated. Officers and directors of Industrial were substantial stockholders in Miami Window Corporation for eighteen months of that period and Industrial's president was also president of the appellee corporation for almost a year, during which time appellee was selling its product in Industrial's "exclusive" territory. Industrial was, therefore, held chargeable with knowledge of and consent to these expanded activities by the appellee in its "exclusive" territory in line with the provisions of the license agreements between Belmont on one side and Industrial and Miami Window, respectively, on the other. Further, the Westmans and their associates, owners of ninety-five percent of Industrial, were large stockholders in Miami Window and, therefore, real beneficiaries of its heavy volume of sales in states other than Florida.

Moreover, this "invasion" by appellee of the territory assertedly set aside for appellant by its license agreements from Belmont did not deprive appellant of any sales or otherwise injure it before July 15, 1953. Until that time, Industrial was not producing a weatherstripped window under the Belmont patent, whereas Miami Window had produced such a window since 1950 and during almost all of the time that Industrial was in production of windows under the license agreement. Also, from October, 1950 until July, 1953, Industrial was able to use, and did use, all of its aluminum quotas under government priority allocation in the manufacture of windows. Sales outside Florida of these "Series 51" windows, admittedly produced under the Belmont patents, were discontinued in the summer of 1953 and manufacture of this window was stopped altogether at about the same time even though Thomas Belmont did not can-

cel the license agreement with appellee until August, 1954.

We come, therefore, to the remaining issue, whether Miami's "Series 54" and "Series 6400" windows, produced to the exclusion of all others for sale outside the State of Florida subsequent to August, 1953, infringed upon the Belmont-Stearns "912" and "044" patents and thereby violated the rights of Industrial under its license agreements with Belmont. The District Court held, as a matter of fact, that there was no infringement and that Miami Window was within its rights after that date in making the sales which are challenged in this action. Appellant bases its claim for reversal on the charge that these findings and conclusions were clearly erroneous. We do not agree.

The trial Court took up each of the patents, hearing the testimony of the witnesses including the experts, given while a model of the Miami "54" window and one of the windows manufactured by Industrial were before the Court as exhibits. Under the heading "The 912 Patent v. the Series 54 Window," the Court took up the claims of that patent which were asserted by Industrial to be infringed (Claims 5, 6, 7 and 8), together with the application therefor, and considered them in connection with thirteen patents issued before the "912" and relied upon by appellee as constituting the Prior Art. It found that these claims were not infringed by the "Series 54" window, setting forth in clear detail[7] the bases of the finding.

The same procedure was followed by the Court in considering "The 044 Patent v. The Series 54 Window". Claims 1 and 5, assertedly infringed, were set out in its Findings and were examined in the light of the Prior Art as portrayed by seven patents which were before the Court. It found that "every feature of the 044 Patent claimed as new that is common to the Series 54 Window is also common to the prior art * * *. The series 54 and 6400 window structures of the Miami Window Corporation do not infringe the claims of patents 912 or 044."

The exhibit models of the competing windows were before us in the argument, and we have followed carefully the able factual presentation made by appellant both in the oral argument and in the brief. Heavy reliance is placed upon the

7. The last few paragraphs of this portion of the Findings of Fact set forth in summary the decisive facts lying at their base:

"39. All features of the 912 patent that are claimed as new that are common to the Series 54 window are also found in the prior art.

"40. During the prosecution of the application for the 912 patent it was repeatedly stated that the novel concept in the structure to which the claims in suit are directed resided in positioning of all the elements of the balances locking triangle in the space between the window section and the frame when the window section was closed. During the prosecution of the application for the 912 patent it was repeatedly stated that the frame is ⅞ of an inch deep (Defendant's Exhibit No. 1, Pages 45, 65, 84, 96 and 97).

"41. By extending the operating element through the back wall of the frame and pivotally connecting the lower end thereof to the brack rearwardly of the back wall, defendant's locking triangle brings the window section in against the frame much more tightly than would be the case if the pivotal connection were positioned in the space between the window and the frame when the window is in closed position and thereby serves to reduce air infiltration. As compared to the location of the lower pivot in the 912 patent in a frame of a ⅞ inch depth, the lower pivot of defendant has been moved approximately 200 per cent to the rear thereof.

"42. In view of the prior art, the claims in suit must be restricted to a window structure with all the elements of the balanced locking triangle 'housed in the space between the section and the frame when the window is closed' and in which no part of the elements of the balanced locking triangle protrude through any part of the frame.

"43. Claims 5, 6, 7 and 8 of the 912 patent are not infringed by the Series 54 Window inasmuch as the lower pivot of the hinge links and the part that carries such pivot are not 'housed in the space between the section and the frame when the window is closed'."

testimony of appellant's expert, Hughes, and we have read this with interest. Appellant's argument is largely a factual one with few citations of authorities.[8] Appellee replies in detail to this factual argument and cites many authorities in support of its position that the Court properly considered the Prior Art in determining the scope of the patent and whether there had been infringement.[9] Appellee stresses the contention, which it conceives appellant does not dispute, that Belmont (and his licensor, Morris) did not invent the awning window nor any single one of the numerous elements employed in its structure, but that the patents were granted on the premise of novel combinations of old elements, thus making the patents secondary and not primary.[10]

The District Court spent nearly a week hearing evidence and the case was fully argued and was taken under advisement. The Court entered detailed and exhaustive findings of fact, sixty-one in number and occupying twenty-five pages in the record. Every phase of the case and contention of the parties was taken up and covered fully by a fact-finding which demonstrated a complete grasp of the evidence and of the legal principles involved; and these, together with the entire record of the trial, carry an unusual degree of assurance that the case was tried intelligently and fairly and decided correctly.

Basically, the issues before the lower Court were issues of fact. The case was vigorously contested and skilfully han-

dled and was fully placed before the lower Court in all of its complicated aspects. The Judge handling the case was quite experienced in the trial of patent cases, and demonstrated his unique ability in the trial of this case. In our opinion, the Court below reached the correct conclusion and its findings are fully sustained by the evidence. The judgment is, therefore,

Affirmed.

8. 40 Am.Jur., Patents, Sections 155 and 156, Livesay v. Drolet, D.C.S.D.Fla.1941, 38 F.Supp. 885; Livesay Industries, Inc., v. Livesay Window Co., 5 Cir., 1953, 202 F.2d 378.

9. E. g. Sinko Tool & Mfg. Co. v. Casco Products Corp., 7 Cir., 1937, 89 F.2d 916, certiorari denied 312 U.S. 693, 61 S.Ct. 713, 85 L.Ed. 1129; Midland Steel Products Co. v. Clark Equipment Co., 6 Cir., 1949, 174 F.2d 541, certiorari denied 338 U.S. 892, 70 S.Ct. 243, 94 L.Ed. 548; Dixie-Vortex Co. v. Paper Container Mfg. Co., 7 Cir., 1942, 130 F.2d 569, certiorari denied 317 U.S. 686, 63 S.Ct.

260, 87 L.Ed. 550; Hubbell v. United States, 1900, 179 U.S. 77, 21 S.Ct. 24, 45 L.Ed. 95, and Stewart-Warner Corp. v. Lone Star Gas Co., 5 Cir., 1952, 195 F. 2d 645.

10. Reliance is placed upon Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co., 1911, 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527; Cincinnati Milling Machine Co. v. Turchan, 6 Cir., 1953, 208 F.2d 222; Schriber-Schroth Co. v. Cleveland Trust Co., 1940, 311 U.S. 211, 61 S.Ct. 235, 85 L.Ed. 132, and White v. Gage, 5 Cir., 1942, 128 F.2d 500.